Clarence Allen **LACKEY**, Appellant,

v.

**The STATE of Texas, Appellee.**

**No. 61094.**

Court of Criminal Appeals of Texas,
En Banc.

April 7, 1982.

On Rehearing Sept. 15, 1982.

Jack Stoffregen, Lubbock, for appellant.

John T. Montford, Dist. Atty., Lubbock, Yvonne M. Faulks, Asst. Dist. Atty., Robert Huttash, State's Atty., Austin, for the State.

OPINION

McCORMICK, Judge.

Appellant, after being found competent to stand trial in an Article 46.02, Section 4, V.A.C.C.P., jury competency hearing, was convicted of capital murder. Punishment was assessed at death. The sufficiency of the evidence is not challenged.

Diane Kumph was abducted from her Lubbock apartment shortly before dawn on July 31, 1977. Later that day, her partially nude body was discovered beside a dirt road outside of Lubbock, near appellant's house. It appeared Kumph had been raped. She had been severely beaten. Her neck, face, arms, chest, back and legs were covered with bruises. Her throat had been slashed. This caused her death.

A policeman who responded to a neighbor's report testified that it appeared that the front door of Kumph's apartment had been kicked open. There were indications that a violent struggle had occurred in her apartment.

A fingerprint expert testified that a latent fingerprint discovered on a cigarette package found in the victim's bed belonged to appellant. The brand was the same brand as a pack found on appellant at the time of his arrest. Blood found on appellant's boots matched Kumph's blood type. Secretor analysis showed that the individual whose semen was found in Kumph was a secretor and had the same type O blood as did appellant. An expert testified that hairs found on Kumph's body were similar to appellant's and marks found on the door of Kumph's apartment were very similar to the heel print of appellant's boot. A person living in the adjoining apartment testified that he was awakened in the early morning, went outside, and saw a man matching appellant's physical description driving away in a white pickup. A woman was slumped over in the seat. The truck was missing a hubcap from the right rear wheel. Appellant, at the time of the murder, had use of a white pickup that was missing a hubcap from the right rear wheel. Appellant was identified by an acquaintance as

having been in this truck, driving in Lubbock at approximately 5:00 a.m. on the morning of Kumph's abduction.

Another resident of the adjoining apartment testified that she was awakened that morning by loud banging, and screams of "help me" and "get off me" coming from Kumph's apartment.

Appellant's roommate, Carrol Johnson, testified that she had been at work all night the night of the murder. When she returned home that morning, about 7:30 a.m., appellant was not home, but there was fresh blood all about the house. Shortly after her return, appellant phoned Johnson and said he was doing some laundry at a laundromat. He arrived at the house a half hour later with a bedspread and sheets he had washed. He burned a throw rug. Later that day, as Johnson and appellant were discussing radio reports of the murder of Kumph and the search for a suspect, appellant admitted to Johnson: "Baby, I've got to tell you something—I'm the one they're looking for."

More incriminating evidence was seized in a search of appellant's house and the white truck. Leaves found on Kumph's face were very similar to leaves found in the truck, according to expert testimony. Hair taken from the truck was very similar to Kumph's, according to the expert. Sweepings from appellant's apartment revealed hair that was very similar to Kumph's, according to more expert testimony. Blood found throughout appellant's home matched Kumph's blood type, including that found on a blood soaked mattress. Blood was also found on the porch and on the exterior of appellant's house. That blood matched Kumph's type. Blood was found on a knife located in the house. Blood found on the pickup matched the deceased's type. The case was submitted to the jury on a circumstantial evidence charge.

Appellant contends that the trial court erred in refusing to appoint a psychiatrist of appellant's choice to examine appellant. Appellant was indigent. On September 29, 1977, a pre-trial motion was filed by appellant requesting that one of three named psychiatrists be appointed to examine appellant. The motion went on to state, "Failing this, Defendant prays for commitment to a reputable mental hospital for complete psychiatric examination." Appellant, at that time, was confined in the Lubbock County jail. Two of the experts he had requested practiced in Dallas and one practiced in Los Angeles. The trial court granted the alternative portion of appellant's motion by ordering appellant be taken to the Big Spring State Hospital for evaluation. The appellant made no objection to this procedure when it was ordered. Since appellant's motion was granted, nothing is presented for review. Regardless, it is not error to refuse a defendant's request for examination by a particular psychiatrist and to substitute an alternative expert. In *Payne v. Thompson,* 622 F.2d 254 (6th Cir. 1980), cert. denied 449 U.S. 1063, 100 S.Ct. 788, 66 L.Ed.2d 607 (1981), the court said:

"Nor can we find a federal constitutional violation in the state trial court's refusal to provide expert witness and psychiatric examination by witness of his (defendant's) own choosing. See *U. S. ex rel Smith v. Baldi,* 344 U.S. 561, 73 S.Ct. 391, 97 L.Ed. 549 (1953)." 622 F.2d at 255.

See *Satterfield v. Zahradnick,* 572 F.2d 443 (4th Cir. 1978), cert. denied 436 U.S. 920, 98 S.Ct. 2270, 56 L.Ed.2d 762 (1978). In that case, the Fourth Circuit stated: " . . . [W]e are of the opinion, on authority, that there exists no constitutional right to the appointment of a private psychiatrist of the defendant's own choosing at public expense." 572 F.2d at 445. The ground is overruled.

Appellant also complains that the court erred in refusing him more than $500 in funds for investigation and expert testimony pursuant to Article 26.05, V.A.C.C.P. Article 26.05, supra, provides, in pertinent part:

"Sec. 1. A counsel appointed to defend a person accused of a felony or a misdemeanor punishable by imprisonment, or to represent an indigent in a habeas corpus hearing, shall be paid from the

general fund of the county in which the prosecution was instituted or habeas corpus hearing held, according to the following schedule:

" * * *

"(d) For expenses incurred for purposes of investigation and expert testimony, a reasonable fee to be set by the court but in no event to exceed $500; . . ."

On December 2, 1977, appellant requested $500 for investigative fees for expenses apparently not yet incurred. The trial court granted the motion. On February 6, 1978, after jury selection had begun, appellant filed a new motion contending that the defense had incurred or had agreed to incur expenses of more than $500 but did not specify the amount. This motion requested extra funds for

"... various experts in the fields of medicine, psychiatry, and psychology, concerning their conducting examinations and tests on issues of competency, sanity and punishment. Defendant has also contacted an analytical chemist to examine the State's blood and hair exhibits and to conduct independent analyses of the exhibits."

As noted above, psychiatric and psychological tests had been performed on appellant at appellant's request. The expenses for these exams were apparently paid directly by the court and were not charged to appellant's $500. In effect, therefore, appellant had the use of more than $500 in investigative expenses. Appellant, in his February 6, 1978 motion, requested $1000 in additional money. He failed to inform the trial court how the original $500 had been used.

On June 1, 1978, appellant filed a formal bill of exception concerning the denial of the additional funds. This included a sworn statement from one of appellant's attorneys. The statement said that appellant's attorneys had wished to employ a chemist but were unable to do so because they had expended the $500 that had been allocated by the court. It is apparent from the bill that the February 6, 1978 request was for future use and not for expenses already incurred.

Appellant now complains that the denial of the additional funds requested on February 6, 1978 was reversible error. Since the expenses had not yet been incurred, there certainly was no abuse of the trial court's discretion by denying the motion at that time. *Henriksen v. State,* 500 S.W.2d 491 (Tex.Cr.App.1973); *Myre v. State,* 545 S.W.2d 820 (Tex.Cr.App.1977). In *Wallace v. State,* 618 S.W.2d 67 (Tex.Cr.App.1981), this Court said: "Under Art. 26.05, V.A.C. C.P., counsel is entitled to reimbursement of investigation expenses only after they are incurred and even then reimbursement is discretionary with the Court."

Here, the trial court had approved and allocated $500 for experts and investigation to be used as appellant desired. Appellant made no showing why that $500 granted earlier was not sufficient or that the funds were for different types of experts than those previously used. Surely a defendant cannot expect to obtain expert opinion after expert opinion after expert opinion at public expense in the mere hope of stumbling across an opinion that meets his approval.

While in certain cases there may be a constitutional right for an indigent defendant to have funds for expert investigation or testimony, this right does not give a defendant carte blanche. Here, unlike cases cited by appellant, a substantial sum was allocated and used by the defendant for expert testimony. See *United States v. Crim,* 527 F.2d 289 (10th Cir. 1975), cert. denied 425 U.S. 905, 96 S.Ct. 1497, 47 L.Ed.2d 755 (1976). In that case, the Tenth Circuit rejected a defendant's claim that the $300 allocated by the trial court for investigation was inadequate. See also, *United States v. Erb,* 596 F.2d 412 (10th Cir. 1979), cert. denied 444 U.S. 848, 100 S.Ct. 97, 62 L.Ed.2d 63 (1979). The Arizona Supreme Court, quoting the Indiana Supreme Court, has said: "... when the court is allocating state funds for the defense of a defendant it is rational for the court to use discretion in granting or denying the defendant's requests. Within the primary goal of the judicial process, which is due

process of law for each defendant, the court may determine which expenses are probably needless, wasteful or extravagant." *State v. Greenwalt,* 624 P.2d 828 (Ariz. 1981), at 834. The Arizona court there upheld the refusal to allow certain expenditures for investigation.

Even if the trial court had erred in refusing the additional funds, no harm has been shown. A contention similar to that now advanced by appellant was recently discussed in *People v. Browning,* 106 Mich. App. 516, 308 N.W.2d 264 (1981). There, a defendant had been convicted of murder and appealed the trial court's refusal to appoint an investigator, chemist and pathologist at public expense. The Michigan court said: "Absent some showing that the test results reached by the prosecutor's expert witnesses were in error or that the testing procedures were inadequate, the trial judge did not abuse her discretion in denying defendant's request for the appointment of experts to conduct similar tests." 308 N.W.2d at 269. See also, *State v. Parton,* 303 N.C. 55, 277 S.E.2d 410 (1981). Likewise, in *Freeman v. State,* 556 S.W.2d 287 (Tex.Cr.App.1977), cert. denied 434 U.S. 1088, 98 S.Ct. 1284, 55 L.Ed.2d 794 (1978), a capital murder defendant argued that refusal to grant more than $500 in investigation expenses was error. This Court, however, held that absent a showing of harm, refusal of investigative expenses would not require reversal.

We would also note that appellant's motion which was denied was not timely since jury selection had already begun. See *United States v. Williams,* 616 F.2d 759 (5th Cir. 1980), cert. denied 449 U.S. 857, 101 S.Ct. 156, 66 L.Ed.2d 72 (1981). Appellant's ground is without merit.

Appellant, in his next ground of error, says, "The trial court committed reversible error by allowing Carrol Johnson to testify against appellant." Appellant contends that the court erred in allowing Johnson to testify because he alleges that she was his common-law wife.

The record reflects that Johnson was called by the State as its last witness. She testified before the jury without objection that she had lived with appellant for some four months prior to the murder. However, at the time of her testimony, she was living with another man. She said that on the night of the murder she had worked all night at the Texas Instruments plant. She testified that when she returned home that morning there was a large amount of fresh blood on the bedroom carpet and about the house. Appellant was not there but phoned and said he was doing laundry.

Johnson testified to the foregoing without objection. Appellant thereafter objected when the State inquired about the conversation between appellant and Johnson following appellant's return to the house:

"MR. RICHARDS (Attorney for the Defendant):

—well, sir, at this point, I would object to any statement made by the testimony to Carroll Johnson on the basis that she is his wife and cannot, by law, testify against him."

"THE COURT: Overruled."

The State immediately elicited from Johnson that she and Lackey had lived together for four months. Johnson testified that she never considered herself married. Though on a handful of occasions she had used the name Carrol Lackey for convenience, she had never represented to friends, family or associates that she and appellant were married. Johnson never testified that she and appellant lived together as husband and wife. After the State had inquired into the relationship between Johnson and appellant, the following occurred:

"MR. GRIFFIN: (Attorney for the Prosecution)

May we approach the bench?

"THE COURT: You may.

"MR. GRIFFIN: I propose to go ahead with the other examination, Your Honor.

"THE COURT: Wait just a minute.

"MR. GRIFFIN: I just wanted to tell you that I intended to pursue the other examination now. There's no further

intention to go into this matter at this time.

If you want to make a further objection, that's the reason I—

"MR. RICHARDS: (Attorney for the Defendant)

I can't ask for a ruling on this matter of law, but I don't have no objections at this time, do you Phil?

"MR. BROWN: (Attorney for the Defendant)

I guess not.

"THE COURT: All right.

Please proceed."

The State then asked about what happened when appellant returned the morning after the murder, what he did upon his return and what was said. All of this questioning came in without objection from appellant. There was no other testimony about Johnson's relationship with appellant from any source other than from Johnson.

Appellant now contends that the court violated Article 38.11, V.A.C.C.P., in allowing Johnson to testify at all against appellant. Article 38.11, in pertinent part, says:

"Neither husband nor wife shall, in any case, testify as to communications made by one to the other while married. Neither husband nor wife shall, in any case, after the marriage relation ceases, be made witnesses as to any communication made while the marriage relation existed except in a case where one or the other is on trial for an offense and a declaration or communication made by the wife to the husband or by the husband to the wife goes to extenuate or justify the offense. The husband and wife may, in all criminal actions, be witnesses for each other, but except as hereinafter provided, they shall in no case testify against each other in a criminal prosecution. . . . "

This is a two pronged privilege. A person, though no longer married, may not testify as to confidential communications made by his spouse during the marriage. The second part of the privilege is that neither a husband nor a wife may be a witness against his spouse during the existence of the marriage whether or not the subject of the testimony is a confidential communication. This absolute disqualification dissolves upon dissolution of the marriage but the ban on testifying about communications remains.

This Court has held that Article 38.11, supra, applies to common-law marriages, *Bush v. State,* 159 Tex.Cr.R. 43, 261 S.W.2d 158 (1953). However, the claim of a common-law marriage will be closely scrutinized, *Bodde v. State,* 568 S.W.2d 344 (Tex. Cr.App.1978), cert. denied 440 U.S. 968, 99 S.Ct. 1520, 59 L.Ed.2d 784 (1979). There are three elements essential to a common-law marriage: (1) an agreement to become husband and wife, (2) cohabitation pursuant to that agreement, and (3) a holding-out of each other to the public as husband and wife. See *Bodde v. State,* supra.

When the Court in *Bodde* said an agreement to become husband and wife, it meant not an agreement to become husband and wife in the future but an agreement presently to become husband and wife. *Bodde* cited *Chatman v. State,* 513 S.W.2d 854 (Tex.Cr.App.1974), for the "becoming" language. *Chatman* cited *Welch v. State,* 151 Tex.Cr.R. 356, 207 S.W.2d 627 (1948), which also used the "becoming" phrase. *Welch* used as its authority *Texas Employers Insurance Association v. Soto,* 294 S.W. 639 (Tex.Civ.App. El Paso, 1927, writ dismissed). In that case, the Court of Civil Appeals said:

"To constitute the marital relation of husband and wife at common law . . . there must be a mutual assent or agreement, express or implied, between the man and woman to become then and thenceforth husband and wife and, pursuant to such consent or agreement, followed up by a living together in such agreed relationship." 294 S.W.2d at 640.

Thereafter, when the case was cited, the words then and thenceforth were deleted. That the requirement of a present agreement to be married is the proper test is evident from examining the civil cases. In *Rosetta v. Rosetta,* 525 S.W.2d 255 (Tex.Civ. App.—Tyler, 1975, no writ), the court said: "Present agreement to be married is a nec-

essary element of common law marriage and it is not sufficient to agree on present cohabitation and future marriage." 525 S.W.2d at 261.

There was no evidence that Johnson and appellant lived together as husband and wife. There was no evidence that Johnson and appellant considered themselves married. They did not hold themselves out as married to the general public. Appellant failed to object to Johnson's damaging testimony and in fact specifically withdrew an earlier objection after the State showed that Johnson did not consider herself married and did not tell her friends and associates she was married. The trial court did not err in allowing Johnson to testify. See *Shields v. State,* 402 S.W.2d 761 (Tex.Cr. App.1966).

Appellant also appears in this ground to complain of the failure of the trial court to instruct the jury to disregard Johnson's testimony unless they first found she was not appellant's common-law wife. If so, that renders this ground multifarious and there is no need for this Court to consider it. *Williams v. State,* 605 S.W.2d 596 (Tex.Cr. App.1980).

Regardless, as noted above, appellant withdrew his objection and all of the damaging evidence came in without objection. There was no proof that would support a finding of common-law marriage because there was no proof of all the elements that are required of a common-law marriage and therefore no charge was required, *Welch v. State,* supra. There was no reason to submit the issue to the jury because there was no dispute as to fact. All of the evidence concerning Lackey's relationship with Johnson came from Johnson's testimony. Therefore, there was no disputed fact issue for the jury to decide. The only question presented was a question of law.

Finally, as noted in *Bodde v. State,* supra, citing Wigmore, the better practice is not to submit the issue to the jury. Appellant's ground is overruled.

Appellant further claims that, if appellant and Johnson were not married at common-law, the trial court, in allowing John-

son to testify, denied appellant equal protection of the laws. This is argued because Article 38.11, supra, applies only to married couples and not to others who have equivalent relationships based on "love, privacy, intimacy and cohabitation."

While we see no merit in this ground, appellant did not object on this ground at trial. Therefore, nothing is presented for review, *Sloan v. State,* 515 S.W.2d 913 (Tex. Cr.App.1974).

Appellant next contends that the trial court erred during trial by admitting five photographs of the body of Diane Kumph, pictures he terms "inflammatory."

The photos show Kumph's body with her throat slashed. The pictures showed the body as it was found. Since a verbal description of the body and its location was admissible, there was no error in admitting the photographs. *Woodkins v. State,* 542 S.W.2d 855 (Tex.Cr.App.1976), cert. denied 431 U.S. 960, 97 S.Ct. 2688, 53 L.Ed.2d 279 (1977); *Blansett v. State,* 556 S.W.2d 322 (Tex.Cr.App.1977).

It is impossible to determine the exact subject of appellant's fourth ground of error, the ground on which the dissent would decide this case. Appellant seems to complain initially that Johnson lacked the authority to consent to the search of the truck and, therefore, the fruits of that search should not have been admitted. Then, it appears that appellant's ground is based upon the failure of the trial court to submit the question of Johnson's *authority* to consent to the jury as a factual question. Finally, he complains that the *voluntariness* of Johnson's consent should have been submitted to the jury for their determination as a fact question.

Never is complaint made that the evidence obtained as a result of the search of the house or the truck should have been excluded from evidence because Johnson's consent was not voluntarily given. The ground on which the dissent bases its opinion is not complained of, is not before this Court, and should not be considered by this Court.

Second, even if in this ground one could locate the issue discussed by the dissent, the ground would be multifarious and not subject to review. Article 40.09, Section 9, V.A.C.C.P. *Williams v. State,* 605 S.W.2d 596 (Tex.Cr.App.1980); *Rodriguez v. State,* 530 S.W.2d 944 (Tex.Cr.App.1976).

Third, even if the ground examined by the dissent were properly before this Court, the appellant failed to preserve any error because his objection at trial was not specific enough to inform the trial court of the nature of his objection.

On December 19, 1977, a pretrial hearing was held pursuant to Article 28.01, V.A.C. C.P. A number of pretrial matters were heard at that time. No motion to suppress had been filed nor was any such motion heard that day. At the conclusion of the December 19, 1977 hearing, appellant's counsel told the court that a motion to suppress might be filed later. The court stated that any other pretrial matters would be heard at the beginning of trial on January 16, 1978. The beginning of the trial was later delayed until February 15, 1978.

On February 15, 1978, the day the case was set for trial, appellant filed a motion to suppress the items seized as a result of the August 2, 1977 search of his residence and truck. As basis for the motion, appellant stated:

### I.

"While law enforcement officers were trying to arrest Defendant on basis of arrest warrant, members of Lubbock County Sheriff's Office, Lubbock Police Department, Texas Rangers, and Criminal District Attorney's Office of Lubbock County, Texas, went to residence of Defendant and conducted a warrantless search of Defendant's pickup truck and residence, seizing fifty (50) plus items of evidence.

### II.

"*Defendant did not consent* to such search and seizure.

### III.

"No exigent circumstances excused law enforcement officers from securing search warrants before conducting this search." (Emphasis added)

Nowhere in this motion was the theory advanced that Johnson's consent to the search was not voluntarily given.

The record reflects further that the motion to suppress had been sworn to in September, 1977, by appellant, though it was not filed until the day of trial. On February 15, 1978, just before the trial commenced, the trial court called the motion to suppress to be heard. At that time the following transpired:

"[Defense Counsel]: Yes, sir, in regards to the Motion to Suppress so the record will be clear, we ask that it be considered as other items in the Motion in Limine and that we have no pre-trial determination on this matter, but only when any of the evidence secured from a search of the residence and vehicle of this defendant on August 2, 1977 is offered, that it first be shown admissible outside the presence of the jury.

"THE COURT: Now—is that the end of your statement?

"[Defense Counsel]: Yes, sir."

The trial court then ruled:

"... It appears to the Court that this matter could have, very easily, been filed and presented on the pre-trial hearing on the date of December 20, 1977 and been developed in Lubbock County, Texas.

"Now, the defendant comes forward and says that he doesn't urge that as a Motion to Suppress as such, but ask that a hearing be held in connection with the Motion in Limine.

"The Court carries the Motion to Suppress and carries the same as requested by the defendant that it be considered as a Motion in Limine and it carries it and will hear it all at the same time when the evidence is presented by the State before the jury and a separate hearing at this time will not be conducted."

During trial, Detective Hargrave testified about the August 2 search of appellant's house. Appellant initially objected to the testimony, saying, "I think there's a real issue in this case as to the validity of any consent to search." The State then elicited testimony from Hargrave that Carroll Johnson, appellant's roommate, gave officers consent to search. Appellant objected to this testimony on the ground that the consent was hearsay. The objection was overruled.

Thereafter, appellant objected to · the search on the grounds that such testimony "would violate the 4th and 14th Amendment of the U.S. Constitution as well as Art. 1, § 9 of the Texas Constitution because they have not shown the authority to search, only hearsay." The appellant secured a running objection to the search. Never, prior to the close of evidence, did appellant contend that the consent was involuntary or coerced, nor did he ever object on that ground.

After Hargrave testified, experts testified about the fruits of the search. Appellant always made the same objection, never hinting that he challenged the voluntariness of the consent.

Johnson was the State's primary and last witness. She testified without objection about the blood she found in the house she shared with appellant on the morning after the murder and about appellant's inculpatory actions and statements. Following the murder, she had been provided shelter by the State. During her testimony, appellant still never objected to the search on the ground that the consent was not voluntarily given.

In *Smith v. State*, 571 S.W.2d 168 (Tex. Cr.App.1978), this Court, in dealing with a defendant's objections to the admission of pen packets, stated:

"... Appellant's only objection, on constitutional grounds to the admissibility of the 'pen packets' was 'they would be in violation of the 5th, 6th, and 14th Amendments to the United States Constitution.'

Appellant never designated any particular grounds upon which these pen packets violated the constitutional provisions cited. Therefore, nothing is presented for review." 571 S.W.2d at 169, 170.

Here, also, while the constitutional provisions were cited, it was not urged that the consent was not voluntary. See, *Martin v. State*, 610 S.W.2d 491 (Tex.Cr.App.1980). There, the appellant at trial challenged a consent to search on the ground that the consent was involuntary. On appeal, the contention was also made that the consenter lacked the authority to consent. This Court said:

"On appeal additional challenges to the lawfulness of the search are raised. It is asserted that Kimberly did not have authority to consent to a search of the room appellant occupied in the house. Some of the evidence was seized in his room and some in other parts of the house. No objection was made at trial directing the court's attention specifically to those items seized from appellant's room, nor was objection made to Kimberly's authority to consent to a search of that particular room. Consequently, the record was not developed with attention on this issue. Nothing is presented for review in this matter. See *Morrison v. State*, [Tex. Cr.App.] 508 S.W.2d 827, n. 4."

As the dissent notes, in the case before us the State never attempted to establish the facts surrounding the consent. The facts discussed in this opinion and in the dissenting opinion are from statements by Johnson in response to leading questions asked by appellant's attorney. Written consents to search the house and truck, testified to by Johnson and included in the record, were never introduced at trial.[1] Police officers never testified as to the circumstances of the consent. Rather than this being oversight by the prosecuting attorney, it appears from the record that such failures are a result of the lack of specificity of the objection and the failure of the appellant to

1. The consents signed under oath by Johnson reflect that she understood that she need not

consent and that the consent was made freely and voluntarily.

apprise the trial court of the nature of his objection.

A defendant by an objection may require the State to show the basis of the search. This the State did here by showing consent of Carrol Johnson. When the State has then shown that it is basing the search on such consent, it is not unreasonable to require the defendant to inform the court that he challenges the voluntariness of the consent relied on by the State. Such requirement in no way shifts the burden of proof. It certainly does not require "unlimited powers of anticipatory imagination." Rather, it merely insures that the court and opposing counsel will be aware of the issue being argued.

From this record, it is fair to conclude that appellant's objection at trial was interpreted by the trial officials as challenging the authority of Johnson to consent to the searches and not to the voluntariness of that consent. Particularly, in light of the peculiar nature of the facts of this case (the consenter being a key witness for the State, who had been housed by the State and was identified by all as having the same interest as the State), this Court will not overrule the rule of law set out in *Smith v. State,* supra, and, therefore, finds that appellant was not specific enough in his objection to apprise the trial court of the nature of his objection.

Fourth, even if the question of the voluntariness of the consent should be reached in this case, the record reveals that Johnson voluntarily consented to the search of the house she shared with appellant, and we so hold.

The Supreme Court in *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), said that, in determining whether a consent to search is voluntary, all of the facts surrounding the consent must be examined. The determination of the voluntariness of the consent should rest on the totality of the circumstances. An examination of those circumstances surrounding the consent is therefore required.

On July 31, 1977, at 10:30 p.m., police officers arrived at Johnson's house. After asking Johnson's permission, they conducted a search of the house. That search was not contested and is not the basis of appellant's claim.

On August 2, 1977, about 4:00 p.m., Officer Ward of the Lubbock Police Department came to the same house and requested that Johnson go with him to the police station. Johnson agreed and the two went to the station. Johnson had known Officer Ward previously as she had worked with him at Video Independent Theaters several years before. Upon arrival at the station, Ward gave Johnson her *Miranda* rights. The initial questioning lasted for one and one-half to two hours. The thrust of the questioning apparently was directed at Johnson's knowledge of the facts surrounding the crime. Johnson was asked if she had cleaned up the residence on July 31, 1977. She denied having done so. Apparently at this point Ward offered Johnson a polygraph test. She asked if she had to take it. He told her that she did not have to do so but if appellant were proved guilty and if she had lied to the police she could be charged (apparently with murder). The subject of another search had not been broached.

Johnson was crying. She was worried about her children. When Johnson became emotional, Ward discontinued his questioning and a policewoman, B. J. Ellis, came in and spoke with Johnson. Ellis brought Johnson a cup of coffee. Ellis, who had also worked at Texas Instruments, where Johnson worked, talked with Johnson about working there.

Ward later returned and Johnson gave a written statement implicating appellant in the murder and rape of Diane Kumph. After giving the statement, Officer Ellis brought Johnson a consent to search form for the house. This apparently was the first mention of a search. Ellis explained to Johnson that the form would give the police authority to go through her house. Johnson was told that a warrant could be obtained but that the form allowed a search without calling up the judge. Johnson signed a consent form which authorized the

police to search her house. There was never any hint that the officers had brandished guns at any point or had threatened Johnson with violence or harm. There was no evidence that any type of coercion was used in obtaining the consent. Johnson was not under arrest. Johnson then went with the police to the house and there consented in writing to the search of appellant's father's truck that she had been driving. The truck was parked at her house. After the search was completed, Johnson went to the district attorney's office with the police, then back to her house to pick up her belongings. She later returned to the district attorney's office. After that, she was checked into a motel where she spent the night. The bill was paid by the district attorney's office. Appellant had not yet been arrested.

Johnson was one of the State's key witnesses at trial, testifying about the blood in her house the morning after the murder and the admission by appellant.

In analyzing the voluntariness of a consent to search, it is important to remember that factors which might render a confession inadmissible will not vitiate the voluntariness of a consent, though they are relevant to the inquiry, *United States v. Horton,* 601 F.2d 319 (7th Cir. 1979), cert. denied 444 U.S. 937, 100 S.Ct. 287, 62 L.Ed.2d 197 (1979).

Involuntary confessions are excluded from evidence for two reasons. First, an involuntary confession may not be reliable. A person coerced or promised benefits may give an untrue confession. An involuntary confession may be an impediment to the truth finding function of the courts. Therefore, actions by the police that are neither coercive nor offensive may still require that a confession be excluded because there is mistrust of the reliability of the confession. See Wigmore, Evidence, Section 822 (J. Chadbourne rev. 1970); Note, *Developments in the Law: Confessions,* 79 Harvard L.Rev. 935. Second, suppression is a way of deterring police conduct that violates the Constitution and offends societal standards. Therefore, there are dual considerations in determining the admissibility of confessions and the subjective state of mind of the person confessing is a valid consideration or factor, though it can normally be understood by looking to objective actions.

However, in determining the voluntariness of a consent to search, there can be no doubt as to the reliability of the evidence obtained. Whether or not Johnson "voluntarily" consented to the search, blood and hair were in the house. See *Schneckloth v. Bustamonte,* supra, citing *Linkletter v. Walker,* 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), discussing the reliability of evidence obtained by an invalid search. Therefore, the rationale for excluding the probative evidence resulting from a constitutionally invalid search is deterrence of future police conduct that is offensive and coercive or violative of a subject's constitutional rights. See *Linkletter v. Walker,* supra.

In *Schneckloth,* the Supreme Court held there was no need for the State to show that the consenter knew he had a right not to consent. The subject of the court's inquiry should be the objective actions of the police that brought about the consent. If the State shows that the consent was "not the result of duress or coercion, express or implied", the consent is voluntary. See *Schneckloth,* 412 U.S. at 248, 93 S.Ct. at 2059.

Society's interests are well stated in *Schneckloth,* 412 U.S. at 242, 93 S.Ct. at 2055:

"While the Fourth and Fourteenth Amendments limit the circumstances under which the police can conduct a search, there is nothing constitutionally suspect in a person's voluntarily allowing a search. The actual search may be precisely the same as if the police had obtained the warrant. And, unlike those guarantees that protect a defendant at trial, it cannot be said every reasonable presumption ought to be indulged against voluntary relinquishment. We have only recently stated, 'It is no part of the policy underlying the 4th and 14th Amendments to discourage citizens from aiding to the

utmost of their abilities in the apprehension of criminals.' *Coolidge v. New Hampshire,* 403 U.S. [443] at 488, [91 S.Ct. 2022] 29 L.Ed.2d 564. Rather, the community has a real interest in encouraging consent for the resulting search may yield necessary evidence for the solution and prosecution of crime, evidence that may insure that a wholly innocent person is not wrongfully charged with a criminal offense."

Therefore, the purpose of the exclusionary rule should be kept in mind in evaluating the voluntariness of a consent to search and the decision whether to exclude probative evidence from a trial.

A review of what other courts have found to be "voluntary consent" in non-confession cases is relevant. In *United States v. Ryan,* 548 F.2d 782 (9th Cir. 1976), cert. denied 430 U.S. 965, 97 S.Ct. 1644, 52 L.Ed.2d 356 (1977), the issue of whether the consent of an informant was voluntary was raised in an electronic monitoring case. The facts there showed that to secure consent of an informant, the officers told him that should he refuse to consent they would arrest him and they had enough evidence to send him to prison for ten years. If he consented, charges would be dropped. The government official also told him that if he did not cooperate he would lose his livelihood, damage his family and be deprived of special medical treatment. When he asked if he could call an attorney, he was told that he could, but if he did so the "deal" was off. He then consented. The Ninth Circuit, citing *Schneckloth,* found that the consent given was voluntary.

In *Commonwealth v. Merbah,* 270 Pa.Super. 190, 411 A.2d 244 (1979), the court held that the fact that six officers approached the defendant's van, one with his gun drawn, would not vitiate a consent given to search the van, absent other coercive facts.

It has been held that a person in custody, who was told she might be held as a material witness or an accomplice, that she might have to arrange care for her son if she were held, and that a search warrant was being procured, and who then consented to a

search, consented voluntarily. *State v. Reynolds,* 43 Or.App. 619, 603 P.2d 1223 (Or.App.1979), aff'd 289 Or. 533, 614 P.2d 1158 (1980).

In contrast to these cases, the dissent would find the State failed to prove the voluntariness of Johnson's consent on four factors:

(1) the police told her they could get a warrant regardless of her consent;

(2) the officer told her that, if she lied about the murder, charges could be filed against her;

(3) Johnson's subjective fears about her children; and

(4) Johnson's general emotional state at the time of the consent.

(1) The police told her that a warrant could be obtained regardless of her consent.

It has often been held that the statement by an officer that, if consent to search were not granted, a search warrant could or would be obtained will not render a subsequent consent involuntary. See *Stephenson v. State,* 494 S.W.2d 900 (Tex.Cr.App.1973), which held that this type statement will not vitiate consent. See also, *Beaupre v. State,* 526 S.W.2d 811 (Tex.Cr.App.1975), cert. denied 423 U.S. 1037, 96 S.Ct. 573, 46 L.Ed.2d 412 (1975). This Court held there that a statement by the sheriff that "he was going to obtain a warrant to search" did not render a subsequent consent to search involuntary. The federal courts seem to agree with this rule. See, *United States v. Agosto,* 502 F.2d 612 (9th Cir. 1974); *United States v. Savage,* 459 F.2d 60 (5th Cir. 1972); *United States v. Miller,* 589 F.2d 1117 (1st Cir. 1978), cert. denied 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1978).

(2) The officer told her that, if she lied about the murder, charges could be filed against her.

Ward's comment about the possible filing of charges dealt with Johnson's statements about the facts surrounding the murder. Ward, at that time, was still attempting to find out what happened the night of the

murder. Ward, at that time, had no way of knowing if Johnson were involved in the murder. There was never any threat that charges could or would be filed against Johnson if she did not cooperate or consent to the search. In fact, Johnson had already "told the truth" prior to any consent to search being requested. Johnson knew that if she refused, a warrant could be obtained. No threat about charges being filed was ever made concerning the consent to search.

However, some cases concerning threats of filing charges if consent is refused or immunity if consent is given may be noted. In *State v. Christofferson,* 101 Idaho 156, 610 P.2d 515 (1980), the officer, who was searching for evidence of a robbery, promised that if consent to search the premises were given no drug charges would be filed and that he would put in a good word with the judge. The officer also lied and told the defendant that a search warrant was being prepared. Consent was given. The Idaho court held the consent to be voluntary.

In *United States v. Miller,* supra, a defendant consented to a search of luggage only after the authorities pointed out the possible maximum penalties for smuggling and told him they would seek a warrant if he withheld consent. The consent was held voluntary.

A wiretap in which neither party consents to the monitoring of the conversation is a search within the scope of the Fourth Amendment. *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). In *Dowdy v. United States,* 479 F.2d 213 (4th Cir. 1973), cert. denied 414 U.S. 866, 94 S.Ct. 132, 38 L.Ed.2d 118 (1973), the government offered a person immunity for other crimes if he would allow the government to monitor his conversations with Dowdy. The offer was accepted and the calls were monitored. Dowdy then complained that the consent to the search was involuntary due to the coercive nature of the charges against the informant. This contention was rejected by the Fourth Circuit which found the consent voluntary. See also, *United States v. Ryan,* supra, another electronic monitoring case in which the government threatened to arrest the consenter and send him to prison for ten years if he did not consent. He consented. The court held that his consent was voluntary.[2]

(3) Johnson's emotional state at the time of the consent.

On cross-examination, Johnson testified that she had been crying, was upset and emotional at the time of the consent. She never indicated that she did not know that she was consenting to a search. In fact, she testified that before she signed the consent the officers explained that it would enable them to search the house without a warrant. In *Martin v. State,* 610 S.W.2d 491 (Tex.Cr.App.1980), the 15-year-old consenter gave her consent only hours after learning of the murder of her mother and grandmother. In *Martin,* the consent was found to be valid despite the intensely emotional circumstances of the consent.

The fact that the consenter was quite shaken, extremely nervous and had a difficult time even speaking, while indicative of a highly emotional state, did not render the consent involuntary in *United States v.*

---

**2.** A distinction between the voluntariness of consent to a wiretap search and a physical search was attempted in *United States v. Bonnano,* 487 F.2d 654 (2nd Cir. 1973). That court said:

"... In cases involving physical search, the person alleged to have consented is doing something apparently contrary to his own interests or to those of another who often is in some way connected with him. An informer's consent to the monitoring or recording of a telephone conversation is an incident to a course of cooperation with law enforcement officials on which he has ordinarily decided some time previously and entails no unpleasant consequences to him. Hence, it will normally suffice for the Government to show that the informer went ahead with a call after knowing what the law enforcement officers were about." 487 F.2d at 658.

We find the rationale for a distinction unpersuasive at best. Regardless, in the case before us Johnson was aiding her own interest and had decided to turn in appellant and testify against him prior to the discussion of a consent to search. Therefore, according to the *Bonanno* rationale, this case would be more analogous to the consent to monitor cases.

*Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).

**(4) Johnson's concern for her children.**

Johnson never indicated that the officers mentioned anything about her children. This was a subjective fear of Johnson's not related to police conduct. (See the discussion, supra, of the importance of examining police conduct in consent to search cases.) A person's consent prompted by their concern for others does not render consent involuntary. In *United States v. Culp,* 472 F.2d 459 (8th Cir. 1973), cert. denied 411 U.S. 970, 93 S.Ct. 2161, 36 L.Ed.2d 692 (1973), a man and his wife were arrested. Consent to search by the husband was given in hopes that cooperation would result in leniency for his wife. The consent was held to be voluntary. See also, *Nastu v. State,* 589 S.W.2d 434 (Tex.Cr.App.1979), cert. denied 447 U.S. 911, 100 S.Ct. 3000, 64 L.Ed.2d 862 (1980), in which the Court held that, though the defendant made his consent to a search conditioned on his being able to calm his upset wife, his consent was voluntary. In *Rice v. State,* 548 S.W.2d 725 (Tex.Cr. App.1977), this Court found that, though the reason the defendant gave a consent to search his truck may have been his desire that another person not be charged for the offense, this would not render his consent involuntary.

Therefore, it can be seen that the factors listed in the dissenting opinion would not require finding that the consent was involuntary. Those facts must be considered in relation to the totality of the circumstances. An examination of the events leading up to the consent does not show unconstitutional conduct on the part of the police that should be deterred or that would cause Johnson's consent to be involuntary. Johnson's own testimony showed the following:

(1) There had been a prior consensual search on July 31, 1977.

Johnson testified that on July 31 police officers came to her house and asked if they could look through the house. Apparently she consented at that time. The appellant never challenged the voluntariness of that consent. The fact that she had already consented once before to a search makes it highly unlikely that the search on August 2, 1977, (of which appellant now complains) was the result of an involuntary consent. See *Smith v. State,* 530 S.W.2d 827 (Tex.Cr. App.1976).

(2) Johnson voluntarily accompanied Officer Ward to the police station.

Johnson's trip was the result of her own choice. The lack of coercion in her going to the police station lends an ambience of free choice to her circumstances. See *United States v. Mendenhall,* supra, and *Nastu v. State,* supra.

(3) The visit by Ward to Johnson's house and the questioning at the police station occurred, not in the dead of night, but at 4:00 p.m. on a summer's day. Again, this is a factor tending to indicate that the consent given was voluntary. *United States v. Mapp,* 476 F.2d 67 (2nd Cir. 1973).

(4) Johnson had known and worked with Officer Ward previously. This previous association would tend to make the situation less intimidating for a consenter.

(5) After arriving at the police station, Ward read Johnson her *Miranda* rights, including her right to an attorney. Apparently, the situation was not so coercive as to lead her to avail herself of any of her rights. It has been held that advising a person of her constitutional rights is a very important factor indicating that a subsequent consent to search is voluntary. She knew that she did not even have to talk with Ward. Again, the use of that prophylactic warning lends an air of voluntariness to the subsequent consent. See *United States v. Jones,* 475 F.2d 723 (5th Cir. 1973), cert. denied 414 U.S. 841, 94 S.Ct. 96, 38 L.Ed.2d 77 (1973); *DeVoyle v. State,* 471 S.W.2d 77 (Tex.Cr.App.1973).

(6) There is absolutely no indication that Johnson was physically abused or threatened. No guns were ever displayed. There is no evidence of violence or physical coercion of any type. The absence of these coercive factors is indicative that the consent given was voluntary. See *Valerio v. State,* 494 S.W.2d 892 (Tex.Cr.App.1973).

(7) Johnson was a mature, 25-year-old woman with a high school education. Contrast these factors with the consenter in *Lowery v. State,* 499 S.W.2d 160 (Tex.Cr. App.1973), who was only seventeen years of age at the time she "consented" to the search. See also, *Stephenson v. State,* 494 S.W.2d 900 (Tex.Cr.App.1973).

(8) Johnson told the court that, when she became emotionally upset and began to cry, Officer Ward discontinued the questioning. In fact, at that time the female officer brought her coffee and discussed her job at Texas Instruments to calm her down. This hardly conjures images of rubber hoses or coercive police methods that need to be deterred. See *United States v. Busic,* 592 F.2d 13 (2nd Cir. 1978), in which the fact that the weary consenter got sleep before consenting was considered a relevant factor in evaluating the consent.

(9) Johnson, by consenting to a search, was not acting against her self interest. This is certainly not a controlling consideration but nonetheless is important in determining whether a person is acting voluntarily. A person acting against her self interest is less likely to be acting voluntarily than one acting in accord with her self interest.

(10) Johnson gave a written voluntary consent to search. This tends to show that her consent was definite and unequivocal. Generally, a person will consider a decision with more care and deliberation if she signs something rather than making an off-hand verbal consent.

(11) After giving the consent, Johnson was provided with a place to stay the night by the district attorney's office. This occurred after the consent was given but indicates that the State and Johnson were working together. In fact, once Johnson gave a statement implicating appellant, her interest and those of the State coincided and that included Johnson's consenting to the search. See *Villareal v. State,* 576 S.W.2d 51 (Tex.Cr.App.1979), cert. denied 444 U.S. 885, 100 S.Ct. 176, 62 L.Ed.2d 114 (1979), at page 59, in which a deaf mute consented to a search. This Court found that among the factors indicating voluntariness of the consent was the fact that the consenter was actively aiding the State.

(12) Johnson never testified that her consent was involuntary or that she would not have given the consent but for the "coercive" factors listed by the dissent. She testified. The appellant could have asked her those questions. He chose not to do so. He never asked her why she consented. The fact that the consenter never claimed coercion is extremely important in evaluating the consent.

The case cited by the dissent as "instructive" can easily be distinguished from this case. In *Lowery v. State,* 499 S.W.2d 160 (Tex.Cr.App.1973), twenty officers, many with drawn weapons, confronted the girl whose consent was being challenged. The girl in that case was seventeen years old. She was given no *Miranda* warnings. Any consent given by her was oral. She apparently knew none of the officers. The girl in that case denied that she had given any consent to the officers to search the apartment.

*Lowery* does not instruct a finding that in this case the consent given was involuntary.

The totality of the circumstances before us do not reflect that Johnson was subjected to the type of coercion or duress that would vitiate her consent. The conduct of the officers in obtaining consent was not offensive nor violative of anyone's constitutional rights. No societal good would be served by excluding from evidence the items found at appellant's residence and in the truck. The Fourth Amendment does not require such a result. The consent given was voluntary.

The ultimate irony of the dissent's position is that it would "remedy" the "coercion" used on Johnson by reversing appellant's conviction, thereby doing an act that Johnson (the State's star witness whose statement to police led to appellant's arrest and whose testimony sealed appellant's fate) would undoubtedly prefer not be done.

Even if error was committed in admitting the items seized from the search of the house or the truck or both, such error was harmless beyond a reasonable doubt.

It would be difficult to imagine a stronger case than that found here and set out above in detail even absent the evidence found as a result of the searches. Appellant's fingerprint was found on a cigarette pack which was discovered in the deceased's bed after Diane Kumph was abducted. The pack was appellant's brand. A witness, who was apparently awakened shortly after the abduction, saw a man fitting appellant's description getting into a pickup in which a woman was slumped over in the seat. The pickup description was similar to appellant's father's truck. The pickup seen after the abduction was missing the right rear hubcap. Appellant's father's pickup was missing a right rear hubcap. Appellant was seen in the truck just before the murder. Blood found on appellant's boots matched the deceased's type. Semen taken from the victim showed that the man who raped her had type O blood. Appellant had type O blood. Hairs found on the deceased were similar to appellant's. A heel print on the victim's apartment door was similar to the prints made by appellant's boots. Most importantly, appellant made an admission of his guilt to Johnson, and Johnson testified as to the blood found about her house the morning after the murder. The body was found near appellant's home.

In *Brasure v. State*, 291 A.2d 286 (Del. Supr.1972), a truck owned by the defendant was found by police. Several items that had been stolen in a burglary were found in the truck. The defendant's fingerprints were found on one of the items. Later, a search was conducted of the defendant's home. More of the stolen items were found there. These were admitted into evidence. The court held that even if the search of the defendant's home was illegal, the admission was harmless beyond a reasonable doubt.

See also, *United States v. Reid*, 517 F.2d 953 (2nd Cir. 1975), in which the court indicates that strong circumstantial evidence may render an error in admitting evidence harmless. The court there said: "The presence of his (defendant's) glasses at the store, of his fingerprints on the stolen Buick station wagon, and of Shea's service revolver at the site of his apprehension in Ohio identified him as a perpetrator of the crime more solidly than the most unblemished identification testimony could have done." 517 F.2d at 967.

In light of fingerprints, admissions, blood and the other evidence linking appellant to the murder, the admission of the complained of evidence would be harmless beyond a reasonable doubt.[3]

If appellant's complaint in this ground is that Johnson lacked the authority to consent to the search of the truck, and therefore, the evidence obtained as a result of the search should have been excluded, the ground is without merit.

The evidence showed that the pickup searched belonged to appellant's father, but it was parked at Johnson's house and she had authority to use it, apparently since her car was not in driving condition. Putting aside the issue of whether appellant had a sufficient expectation of privacy in his father's truck to allow him to challenge the legality of the search, *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), it is clear that Johnson could consent to the search of the truck. Though she lacked title to the truck, the fact that the truck was at her house, that she had authority to use it, and that she had been using it, meant she could consent to its search. *Swift v. State*, 509 S.W.2d 586 (Tex.Cr.App. 1974); *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *Morrison v. State*, 508 S.W.2d 827 (Tex.Cr. App.1974); *Jefferson v. State*, 452 S.W.2d 462 (Tex.Cr.App.1970).

---

3. Even if it were held that Johnson's consent to search was involuntary, it is questionable whether the evidence and subsequent testing of blood from the porch and exterior of the house should be suppressed. Appellant had no expectation of privacy in these areas. They were open and obvious to the public and subject to public access.

If the complaint in this ground is that the trial court erred in failing to submit the issue of Johnson's authority to consent to the search of the truck as a factual issue pursuant to Article 38.23, V.A.C.C.P., the contention is likewise without merit.

Article 38.23, V.A.C.C.P., provides:

"No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.

"In any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained."

Appellant failed to request such a charge or to object on this basis. Appellant objected to the jury charge on the ground that the court failed to instruct the jury to disregard the evidence obtained as a result of the "illegal warrantless search of the 1968 Chevrolet pickup possessed by defendant because Carroll Jean Johnson did not have authority to consent to the search...." However, appellant did not ask that the issue of Johnson's authority to search be submitted to the jury as a factual question pursuant to Article 38.23, supra. Therefore, no error is shown. *Green v. State,* 451 S.W.2d 893 (Tex.Cr.App.1970). Even if appellant had requested the issue be submitted as a fact question to the jury, it would have been proper to refuse to do so. Johnson testified as to her authority to consent. There was no conflicting testimony or evidence. Therefore, the appellant would not have been entitled to such a charge since the only dispute was to the law, not the facts. In *Jones v. State,* 493 S.W.2d 933 (Tex.Cr.App.1973), this Court held:

"Article 38.23, V.A.C.C.P., provides that where the legal evidence raises the issue, the jury shall be instructed that

evidence which they believe or that they have a reasonable doubt was obtained in violation of a provision of the Constitution or a law of the State of Texas, or of the Constitution of the United States, the same shall be disregarded. This statute is applicable only where a disputed fact issue is raised concerning the alleged violation. *Ainsworth v. State,* 493 S.W.2d 517 (Tex.Cr.App.1973).

"Under the facts of this case, no disputed fact issue was raised regarding the legality of the search...."

See also, *Gaffney v. State,* 575 S.W.2d 537 (Tex.Cr.App.1978).

If the complaint in this ground is that the trial court erred in failing to submit the issue of the voluntariness of Johnson's consent to the jury as a factual issue pursuant to Article 38.23, supra, the contention is also without merit.

Appellant failed to request such a special charge. Nor did he object to the charge as given on that ground. No error is shown. *Green v. State,* 451 S.W.2d 893 (Tex.Cr.App. 1970). Regardless, since there was no dispute as to the facts surrounding the search and the voluntariness of Johnson's consent, the only question is a question of law. Therefore, it would have been proper to refuse to submit the issue to the jury, even if properly requested. *Jones v. State,* supra; *Gaffney v. State,* supra.

Appellant, in another multifarious ground of error, contends that the trial court erred in refusing a number of specially requested instructions at the punishment phase of the trial. Appellant fails to point out which instructions are the basis for his appeal. We will, therefore, address the ground as we are able to discern it.

Each of the requested instructions apparently complained of concerned mitigation of punishment and requested that the jury be asked if mitigating factors outweighed aggravating factors or if there were insufficient mitigating circumstances to call for leniency. One requested charge dealt with temporary insanity due to intoxication.

We note that the trial court did instruct the jury that temporary insanity due to intoxication may be taken into account in mitigation of punishment.

Since there was no evidence of provocation, the trial court posed only two questions to the jury at the punishment phase of the trial:

(1) whether the appellant's conduct was committed deliberately with the expectation that death would result, and

(2) whether there was a probability that the appellant would commit criminal acts of violence that would be a threat to society.

Appellant does not complain of the exclusion from consideration by the jury of any evidence. Apparently he feels that all evidence relevant to sentencing was admitted into evidence. Rather, he contends that the failure of the trial court to inquire via special questions whether the jury found mitigating circumstances sufficient to call for leniency violated the Eighth and Fourteenth Amendments to the United States Constitution.

Essentially, the same contention was raised and rejected by the United States Supreme Court in *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). The Supreme Court said: "Thus, the constitutionality of the Texas procedures turned on whether the enumerated questions, (i.e., the statutory questions) allow consideration of particularized mitigating factors." 428 U.S. at 272, 96 S.Ct. at 2956. The Court held that the statutory question concerning future dangerousness would allow a defendant to bring to a jury's attention whatever mitigating circumstances he might show. Therefore, the statute is constitutional since mitigating factors can be shown. It is not constitutionally mandated that the jury be specifically instructed about mitigating factors as long as they are able to consider them in deciding the other questions. The Supreme Court in *Jurek* concluded saying:

"By authorizing the defense to bring before the jury at the separate sentencing hearing whatever mitigating circumstances relating to the individual defend-

ant can be adduced, Texas has ensured that the sentencing jury will have adequate guidance to enable it to perform its sentencing function. * * * Because this system serves to assure that sentences of death will not be 'wantonly' or 'freakishly' imposed, it does not violate the constitution . . . ."

See also, *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), and *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 2524, 65 L.Ed.2d 581 (1980).

Next, appellant puts forth the argument that since the sentence for a prior conviction in Cause 14,629, which was introduced at the punishment phase of the trial, had not been signed by the judge, its admission should not have been allowed.

The record shows that the judgment in Cause 14,629 was properly signed, though the sentence was not. Both were admitted as part of a properly authenticated Texas Department of Corrections pen packet. In *Robinson v. State,* 449 S.W.2d 239 (Tex.Cr. App.1969), this Court held that the failure of a judgment of a prior conviction to reflect a signature by a judge would not render it inadmissible. See also, *Moye v. State,* 220 S.W.2d 651 (Tex.Cr.App.1949).

In *Campbell v. State,* 502 S.W.2d 736 (Tex.Cr.App.1973), this Court said:

"Article 42.01, Vernon's Ann.C.C.P., does not require the judge's signature on the judgment. The fact that the prior judgment and sentence were not signed by the judge does not affect the validity of the former conviction." 502 S.W.2d at 737.

See also, *Rose v. State,* 470 S.W.2d 198 (Tex.Cr.App.1971).

Regardless, since this was the punishment phase of a capital case and no enhancement was alleged, the proper introduction of the signed judgment in Cause 14,629 would render any error in admitting the sentence harmless.

Next, appellant contends that the trial court erred in failing to declare a mistrial when a nonresponsive answer by a witness interjected an extraneous offense into evi-

dence during the guilt-innocence phase of the trial.

In proving that the fingerprints found on the cigarette package belonged to appellant, the State showed that the latent print matched a known print of appellant's. In proving up the known print, the following transpired:

"Q. And who took those fingerprints, please, sir?

"A. I did back May 29, 1971.

"Q. All right. And, do you see the Clarence Lackey whose fingerprints they—

"MR. JOHNSON: Your Honor, just a minute. May we approach the bench?"

Afterward, the trial court sua sponte instructed the jury to disregard the "unresponsive remark" made by the witness. Appellant moved for a mistrial which was denied.

Generally, an instruction to disregard will cure a nonresponsive answer. In *Evans v. State,* 542 S.W.2d 139 (Tex.Cr.App.1976), a burglary case, an officer was asked on direct examination, "And how did you and Mr. Evans (defendant) happen to get together on that occasion?" The officer replied, "It was through investigation concerning the alleged forgeries of some checks." After an objection was sustained, the trial court instructed the jury to disregard the statement. This Court held that such an instruction was sufficient to cure the harm. In *Boykin v. State,* 504 S.W.2d 855 (Tex.Cr.App.1974), a reputation witness, when asked when he met the defendant, replied that he had been robbed by him. The instruction to disregard cured the error.

In the case before us, the implication of an extraneous offense was slight and indirect. Regardless, the trial court's prompt instruction cured any error.

The appellant declares that the trial court erred by refusing to allow a psychologist, David McBride, to testify in rebuttal at the Article 46.02, Section 4, V.A.C.C.P., jury hearing held to determine appellant's competency to stand trial.

The record shows that at the competency hearing appellant, in his case in chief, placed appellant's mother on the stand. She testified about appellant's background. She said appellant was never in special education classes though it was considered, and that he made C's, D's and F's in school. She said appellant's father drank and that caused problems for appellant. She also said he had problems with his memory and did not understand things. She testified that she often saw appellant lay on the floor and stretch out or rock. She also said he had poor verbal skills. She said he did not "catch" jokes and often wet the bed.

Next testifying for appellant was a psychiatrist formerly with Big Spring State School, Lloyd Downing, who had examined appellant for some two and one-half hours. He testified that he had had access to certain tests appellant had been given previously. He also stated that on January 30, 1978, he personally administered tests and portions of certain tests, such as the Bender-Gestalt, Illinois Test for Psycholinguistics Ability, and the Utah Test for Language Development. The psychiatrist testified that as a result of these tests he determined that appellant's "brain isn't hooked up right", and that this was an organic problem. He said appellant was functioning on the level of a ten-year-old and was, therefore, not competent to stand trial. The psychiatrist speculated that appellant's brain disorder might be caused by a form of epilepsy and could be temporal lobe seizure syndrome. He added that the appellant could have a temporal lobe disorder because appellant said things tasted strange, he smelled odd things, and he had abnormal sensations in his intestinal tract. He said the stretching or rocking as a child would be a symptom of brain damage.

Downing testified that an IQ test performed on appellant showed a verbal score of 60 and a performance quotient of 80. This disparity indicated severe problems, according to Downing. He admitted that a report prepared at the Big Spring State School totally disagreed with his analysis. He noted that appellant had a difficult time understanding what he was saying and had

memory difficulties during the interview. Appellant then rested.

The State called Richard Coons, also a psychiatrist. He testified that he had examined appellant for some two and one-half hours. He said that appellant's mood was pleasant and he was oriented as to time and place. There was no evidence of psychotic thinking. He termed appellant's intelligence as dull normal. According to Coons, appellant had an understanding of the proceedings and charges. He stated that appellant could tell him what appellant was charged with, what it meant and about the possible penalties. He could also relate the function of the various persons in the criminal justice system. He concluded that appellant was competent.

On cross-examination, Coons said that appellant told him that appellant smelled things no one else did, but Coons said that was not necessarily indicative of any psychosis. He said appellant had told him he had heard his name called when no one had spoken. He also noted that appellant suffered from a vocabulary deficiency.

Coons stated that if a person had a temporal lobe seizure he would not be competent during the instant of seizure, but said the seizure would only last a few seconds. He stated that earlier a brain scan had been performed on appellant and it was normal. He testified that an EEG had been run and the results had been normal and that he felt appellant was far from being incompetent.

A lay witness then testified about appellant's normal behavior in the jail.

On rebuttal, the appellant called David McBride, a masters level psychologist. The trial court excluded the testimony. The trial court did not assign a reason for this exclusion. We, therefore, may not assume it was because the court found the witness lacked expertise as a psychologist. The State objected on the ground that McBride's testimony, while proper in the case in chief, would be improper in rebuttal because it did not rebut any testimony put on by the State.

On a bill, the appellant elicited that McBride on February 4, 1978, administered tests that Downing had requested: an IQ test, Bender-Gestalt, house-tree-person test, and the thematic apperception test. Concerning the IQ test, the testimony would have shown that appellant scored 73 on the verbal portion and 104 on the performance with an overall quotient of 86, or in the dull normal range. McBride would have testified that this discrepancy between the verbal and the performance portions was indicative of brain damage. The Bender-Gestalt test, according to McBride, also indicated an organic brain condition, sensory aphasia, an inability to receive verbal communications. The other tests did not indicate any organic dysfunctions that could make appellant incompetent, but did indicate certain emotional problems. McBride also would have testified that appellant was cooperative and in a good mood and showed no sign of fatigue or frustration. McBride expressed no opinion as to appellant's competency.

The State contends only that McBride's testimony was not a proper subject for rebuttal because it did not specifically rebut any of the testimony elicited by the State. Article 36.02, V.A.C.C.P., provides:

"The court shall allow testimony to be introduced at any time before the argument of a cause is concluded, if it appears that it is necessary to a due administration of justice."

This Court has often held that this statute and its predecessors mean that testimony may be introduced in the rebuttal portion of a trial whether it specifically rebuts other testimony or not. In *McClellan v. State,* 118 Tex.Cr.R. 473, 40 S.W.2d 87 (1931), this Court held:

"Whether the testimony proposed to be introduced is in rebuttal or not is immaterial if it appears to be necessary to a due administration of justice." 40 S.W.2d at 89.

See also, *Parks v. State,* 437 S.W.2d 554 (Tex.Cr.App.1969); *Douthit v. State,* 482 S.W.2d 155 (Tex.Cr.App.1972).

Downing had testified that appellant had an organic brain dysfunction and because of

that was not competent to stand trial. Coons then testified that appellant was competent. McBride, while not commenting on appellant's competency, would have testified that two psychological tests indicated an organic brain dysfunction.

McBride's testimony was probative as to whether or not appellant suffered from an organic brain dysfunction. Downing stated that such a dysfunction caused appellant to be incompetent. Therefore, McBride's testimony would have been probative as to whether appellant was competent to stand trial.

The State cites us to the case of *Castillo v. State,* 494 S.W.2d 844 (Tex.Cr.App.1973), as standing for the proposition that whether to allow the rebuttal testimony is within the trial court's discretion. In that case, the defendant complained of the court allowing the State to put on certain evidence. This Court held that the decision was within the trial court's discretion and there was no error in *allowing* the testimony. However, it does not follow that the trial court can never abuse that discretion when it refuses evidence.

In *Stone v. State,* 239 S.W. 209 (Tex.Cr. App.1922), the State put on evidence showing that the defendant had attempted to kill the victim without provocation. The State rested. The defendant then called witnesses who testified that provocation existed. The defense rested. The State then countered with more witnesses for its version. The trial court refused to allow the defendant to put on rebuttal testimony further showing the existence of provocation. This Court said:

"That rebuttal testimony must be directed against new matter, and not that brought in in the opening of the case is abrogated by the statute in this state....

"It is within the discretion of the trial court to refuse to hear testimony proffered after the beginning of the argument, and only when the discretion is clearly abused will the action be reviewed.

"Concerning the testimony offered before the argument begins, the discretion of the court is not so broad.... In fact, under the latter circumstances, if the proffered evidence is material and bears directly upon the main issues in this case, it would not be within the discretion of the court to exclude it unless it was offered under conditions which would impede the progress of the trial or in some way interfere with the due and orderly administration of justice."

The Court, therefore, reversed the judgment in that case as there had been no showing that allowing the testimony would interfere with the administration of justice.

More recently, this same view was expressed in *Tucker v. State,* 578 S.W.2d 409 (Tex.Cr.App.1979); *Vital v. State,* 523 S.W.2d 662 (Tex.Cr.App.1975), and *Holifield v. State,* 599 S.W.2d 836 (Tex.Cr.App.1980). In *Vital,* the Court said:

"But irrespective of its weight or of its probative value or cumulative character or the issue upon which it is offered ... if the evidence was admissible and offered before the reading of the charge and prior to arguments, unless it appears its introduction would have impeded the trial or interfered with the due and orderly administration of justice, it will be reversible error to refuse the request to reopen for its receipt." 523 S.W.2d at 664.

Certainly, if it would be error to refuse to allow a defendant to reopen after the close of evidence, it would be error to refuse to allow him to put on testimony in rebuttal as *Stone v. State,* supra, shows.

There was no showing here that allowing McBride to testify would have in any way interfered with the administration of justice and delayed the trial. Compare *Wilkinson v. State,* 423 S.W.2d 311 (Tex.Cr. App.1968), and *Holifield v. State,* supra. Of course, the trial court may, in a proper case, limit the number of experts called by a defendant to a reasonable number, 6 J. Wigmore, Evidence, Section 1908 at 751 (Chadbourne rev. 1976). The trial court erred in refusing to allow McBride to testify.

Finding no other error in this cause, we abate the appeal and remand the cause to the trial court to empanel a new jury within ninety days to determine whether appellant was competent to stand trial when he was tried in February, 1978. A record in that proceeding shall be prepared and transmitted to this Court for further disposition. See *Brandon v. State,* 599 S.W.2d 567 (Tex. Cr.App.1980).

It is so ordered.

DALLY, J., concurs in the result.

TOM G. DAVIS, Judge, concurring.

While I cannot join that portion of the opinion which holds that the issue of voluntariness of Carol Johnson's consent to search was not preserved for review, I agree that the evidence supports the conclusion that Johnson voluntarily consented to the search.

ONION, P. J., joins in this opinion.

ODOM, Judge, dissenting.

I dissent to the majority's disposition of appellant's fourth ground of error, which challenges the validity of Carroll Johnson's consent to search appellant's house and pickup truck. It is conceded that the search was conducted without the authority of a search warrant. The burden was therefore on the State to establish the existence of an exception to the warrant requirement. The record does not show that the State met that burden.

The majority opinion, in an effort to avoid the conclusion that reversible error occurred, pursues no less than five different theories: (1) it is impossible to figure out what appellant's ground of error is; (2) if it is possible to figure it out, it is multifarious and not subject to review; (3) even if it is a proper ground of error, the trial objection was not specific enough; (4) but if the trial objection was sufficient, appellant did not show the consent was involuntary, and, finally, (5) even if the trial court's ruling was erroneous, the error was harmless beyond a reasonable doubt. I find none of these alternatives persuasive and would sustain the ground of error.

I.

The ground of error, as stated in appellant's brief, is: "The trial court committed reversible error by allowing evidence obtained by an illegal search and seizure before the jury." In his argument under this ground of error appellant accurately anticipates the State's reliance on the claimed consent of Carroll Johnson as authority for the search. His argument then presents two fundamentally distinct arguments in support of his ground of error: that the State failed to prove Johnson had authority to consent and that it failed to prove her consent was voluntary. In conjunction with each of these two arguments appellant also advanced the additional contentions that the jury should have been charged on the matter. These two additional contentions are outside the scope of the ground of error as quoted above.

Stripped of the references to the jury charge, which are outside the scope of the ground of error, appellant plainly asserts a failure of the State to meet its burden of proof on the issue. The majority is too narrow in its reading of appellant's argument under this ground of error.

II.

The majority opinion's dismissal of the ground of error as multifarious is likewise inappropriate. The majority overlooks the closing mandate of Article 40.09(9), V.A.C. C.P., which provides:

"... if the court, upon consideration of such ground of error in light of the arguments made in support thereof in the brief, can identify and understand such point of objection, the same shall be reviewed notwithstanding any generality, vagueness, or any other technical defect that may exist in the language employed to set forth such ground of error."

This provision requires consideration of issues raised in a multifarious ground of error if the Court can ascertain the complaint sought to be raised. *Whittington v. State,*

580 S.W.2d 845, 847; *Bright v. State,* 556 S.W.2d 317, 319; *Kalmbach v. State,* 481 S.W.2d 151. The majority has no valid reason to avoid the ground of error.

Furthermore, even if there were no ground of error challenging the search and seizure, or even no brief on appeal, ample authority exists to require this Court to consider the search and seizure issue in the interest of justice. Art. 40.09(13), V.A.C. C.P.[1] In previous cases this Court has considered search and seizure issues in the interest of justice when the brief presented nothing for review because it was filed late, *Booth v. State,* 499 S.W.2d 129, 135; *Green v. State,* 490 S.W.2d 826; *Christopher v. State,* 489 S.W.2d 575; *Stoodard v. State,* 475 S.W.2d 744; *Capuchino v. State,* 468 S.W.2d 379; when the issue was first raised by a supplemental brief, *Deal v. State,* 508 S.W.2d 355; *Johnson v. State,* 436 S.W.2d 906, 909; when the brief raised no ground of error regarding the issue, *Bodde v. State,* 568 S.W.2d 344, 351–352; *Armstrong v. State,* 550 S.W.2d 25; *Phillips v. State,* 548 S.W.2d 44; *Young v. State,* 447 S.W.2d 911; and even when no brief was filed at all. *Kaser v. State,* 505 S.W.2d 806; *Walthall v. State,* 488 S.W.2d 453. In several cases consideration of the search and seizure issue in the interest of justice and independently of any ground of error resulted in reversal of the conviction. *Armstrong v. State; Phillips v. State; Kaser v. State; Stoddard v. State; Young v. State,* all supra. In one of those cases the Court even relied on a record of the hearing on the motion to suppress that had not been included in the original record on appeal, and that was obtained by the Court sua sponte.[2]

### III.

The majority finds both the motion to suppress and the objections during trial were not sufficiently specific to preserve the issue for review.

Regarding these specificity issues, I agree with Judge Clinton that the motion to suppress and the repeated objections to the introduction of the fruits of the search were adequate to inform both the judge and opposing counsel of the basis of appellant's challenge. *Zillender v. State,* 557 S.W.2d 515. See also *Darland v. State,* 582 S.W.2d 452; *Epperson v. State,* 578 S.W.2d 398.

The majority emphasizes that the motion to suppress merely states that the defendant did not consent, instead of contending that *Johnson* did not *voluntarily* consent. But placing such a hypertechnical and specific burden on a defendant when challenging a warrantless search significantly diminishes the protections afforded by the Fourth and Fourteenth Amendments to the U. S. Constitution, as well as Art. 1, Sec. 9 of the Texas Constitution. Furthermore, the majority position fails to acknowledge that these constitutional protections are fortified by the rule that warrantless searches are *per se* unreasonable. *Nastu v. State,* 589 S.W.2d 434, cert. denied 447 U.S. 911, 100 S.Ct. 3000, 64 L.Ed.2d 862; *Hudson v. State,* 588 S.W.2d 348; *Hooper v. State,* 533 S.W.2d 762. That is, once it is established that a search was conducted without a warrant, it is then incumbent upon the State to prove the application of an exception to the warrant requirement.

Appellant's motion to suppress properly alleged the search to be warrantless and the

---

1. The "interest of justice" provision of Art. 40.09, supra, was amended in the 1981 session of the Texas Legislature, but is still the law for all appeals pending in this Court on September 1, 1981, as was the case at bar. Acts 1981, 67th Leg., p. 820, ch. 291, sec. 149.

2. "On original submission from the record before us it clearly appeared that there was a serious question as to the legality of the search and there was evidence that there had been a hearing on a motion to suppress which it was concluded might shed some light on the search question which is of con-

stitutional dimension. Fourth Amendment, United States Constitution; Article 1, Sec. 9, Texas Constitution. The judge assigned the cause requested the transcription of hearing on suppression motion from the trial court through a staff member of this court. When this matter was brought to the attention of the entire court, the majority approved the action taken in light of the original record forwarded to this court." *Armstrong v. State,* 550 S.W.2d 25, 29 n. 1 (on motion for rehearing).

State's burden of overcoming the *per se* rule was then triggered. If it were necessary for a defendant to also allege and deny each possible exception upon which the State may rely (and as the majority proposes, each element, i.e., "voluntariness", of those exceptions), what would be the purpose of the *per se* rule? What would be the purpose of placing an affirmative burden of proof upon the prosecution? Hidden in the rule created by the majority is the requirement that a defendant's counsel, when drafting his motion to suppress, exercise unlimited powers of anticipatory imagination whereby he must project not merely those unknown exceptions the State may in fact rely on but beyond that, he must imagine all possible evidentiary figurations under each of those possible exceptions.[3]

As authority for its position on preservation of the issue for appeal, *Martin v. State,* 610 S.W.2d 491, is cited as controlling. I agree that *Martin* is controlling, but my reading of the grounds upon which the defendant in *Martin* challenged the search is at variance with the conclusions of the majority. There is nothing in that opinion even to imply that an explicit challenge on the ground that the consent was involuntary is required. Indeed, the following quote from *Martin* indicates that the basis of the motion to suppress upon which the issue of voluntariness was reached on the merits is similar to the one filed by appellant in this case:

> "At trial appellant filed a motion to suppress the seized evidence and the identification testimony on the theory that the search was conducted without a warrant and without consent."

By reaching the merits of the issue of voluntariness on the basis of such a motion to suppress, the *Martin* court implicitly held such a motion sufficient to present the issue on appeal. The majority today takes a position in conflict with *Martin.*

Turning to the sufficiency of the objections during trial, the record establishes that at the first opportunity for challenging the State's reliance on the consent exception, appellant's counsel tendered an objection:

[Prosecutor:] "Q. And by what authority did you make a search of the residence that you led the search team to?

"MR. BROWN: Excuse me, Your Honor, at this time, we would like to lodge an objection as to any testimony concerning any search ... I believe he will testify that he had consent to search and I think there's a real issue in this case as to the validity of any consent to search.

"THE COURT: If there is, you can bring it out on cross examination. I mean, we'll develop it if there is ... [4]

"MR. BROWN: We ask that we be given a chance to take this up outside the presence of the jury.

"THE COURT: No. Denied.

"MR. BROWN: Please note our exception.

\*　　\*　　\*　　\*　　\*　　\*

[Prosecutor:] "Q. What authority did you conduct the search at the premises you searched?

[Officer Hargrave:] "A. A voluntary consent to search."

---

3. The majority misperceives the object of this paragraph. While the sufficiency of trial objection is discussed later in this opinion, it is the majority's attack on the motion to suppress that is here examined. The shortcomings of its attack are exemplified in the majority's emphasis on the appellant's failure to allege that *Johnson* did not voluntarily consent. This position would require a defendant to list an unlimited number of persons from whom police officers may have sought consent without knowing the State's theory for subsequently justifying the search at trial. For example, if a defendant resided with a number of people, would it be necessary for counsel to specifically negate consent by each of them? As is the case with the majority argument on the merits, see *infra,* this position shifts the burden to the defendant to plead and prove the nonexistence of a justification for the warrantless search when that burden has been consistently placed on the State.

4. It appears that even the trial court was placing the burden on appellant to negate the existence of voluntary consent instead of on the prosecution to prove it.

Appellant continued to object to each and every reference to the fruits obtained in the search of his residence on August 2nd. The majority holds that "it is fair to conclude that appellant's objection at trial was interpreted by the trial officials as challenging the *authority of Johnson to consent...*" But the following objection clearly demonstrates that the challenge was to the officer's authority to search:

[Prosecutor:] "Q. What kind of pieces of physical evidence?

[Officer Hargrave:] "A. Shingle off the house—

"MR. BROWN: Excuse me, Your Honor, before he finishes his answer, we'd object to any testimony about any evidence seized during the search and seizure of the residence in question in that at this time, such testimony would violate the 4th and 14th Amendments of the U.S. Constitution as well as Art. 1, Sec. 9 of the Texas Constitution *because they have not shown authority to search,* they only have hearsay. (Emphasis added.)

"THE COURT: Overruled."

Appellant's counsel requested and received a "continuing objection to the entire line of questioning", based upon the Fourth and Fourteenth Amendments and Art. 1, Sec. 9. Appellant had specified in his objection immediately preceding this request that the particular aspect of those constitutional provisions being relied on was the requirement of demonstrating authority to search. In addition to securing a running objection, counsel for appellant repeatedly objected to the introduction of exhibits constituting evidence obtained in the warrantless search.[5]

The majority's excerpt from *Martin v. State,* supra, in no way supports its position that appellant's trial objection was deficient, which must be why no attempt is made to apply it:

"On appeal additional challenges to the lawfulness of the search are raised. It is asserted that Kimberly did not have authority to consent to a search of the room appellant occupied in the house. Some of the evidence was seized in his room and some in other parts of the house. No objection was made at trial directing the court's attention specifically to those items seized from appellant's room, nor was objection made to Kimberly's authority to consent to a search of that particular room. Consequently, the record was not developed with attention on this issue. Nothing is presented for review in this matter. See *Morrison v. State,* 508 S.W.2d 827, n. 4."

If the majority supposes the *Martin* court required a specific objection to Kimberly's authority to consent to a search, then the majority should take a closer look at the quoted excerpt. The *Martin* court actually held the defendant's objection was not specifically directed to those items seized from his room. Exclusive reliance was placed on the rule that where part of evidence is admissible and part is not, objection must single out the inadmissible part. See *Morrison v. State,* as cited in the quote from *Martin.* In applying this rule, the *Martin* court stated that neither of two possible ways to satisfy that rule had been followed: "No objection was made at trial directing the court's attention specifically to those items seized from appellant's room, *nor* was objection made to Kimberly's authority to consent to a search of that particular room." (Emphasis added.) *Either* objection would have narrowed the scope of the objection to the portion of the evidence under attack on appeal and would have satisfied the *Morrison* rule relied on in *Martin.* While professing to follow *Martin,* the majority actually misreads it and, as pointed out in reference to the sufficiency of the motion to quash, is in direct conflict with *Martin.*

---

**5.** Although the remainder of those objections were reduced to recitation of the applicable constitutional provisions, counsel had already specifically stated to the court that the validity of the consent was in question and that the State had failed to prove that the search was authorized. As Judge Clinton notes in his dissent, the defendant in *Smith* never specified with such particularity the grounds upon which the evidence objected to violated the cited constitutional provisions. Thus, the majority's implication that *Smith* would have to be overruled in order to find appellant's objection sufficient is without merit.

Finally, the majority concludes that "[n]ever, prior to the close of evidence, did appellant contend that the consent was involuntary or coerced, nor did he ever object on that ground." Yet, as the majority concedes, the State "never attempted to establish the facts surrounding the consent," and never introduced the written consent form.[6] Further, how was it possible for appellant's counsel to object to Johnson's direct testimony when the prosecutor never propounded a single question which would elicit testimony demonstrating voluntary consent? On cross-examination appellant's counsel most certainly challenged voluntariness by establishing the coercive and intimidating nature of Johnson's agreement to sign the form. Johnson's testimony indicates at the very least that consent was given while she was in fear of having capital murder charges filed against her and that officer Hargrave had threatened to obtain a warrant. She had been interrogated for what "seemed like months" and was crying during the entire one and one-half hours of questioning. The State never sought to contradict this testimony, never sought to dispel the obvious implication of coercion. The challenge to voluntariness could not have been much more obvious.

This record clearly demonstrates that the "failures" of the State in not establishing the circumstances of the consent were not a result of vague and impalpable objections. Appellant's counsel specifically challenged the State's reliance on the consent exception and effectively questioned voluntariness in his cross-examination of Johnson.[7]

### IV.

The majority follows its discussion of the specificity of the objection with an alterna-

tive holding that the evidence on the merits of the consent issue supports a finding that the State's burden of proof on voluntariness was satisfied. This conclusion is *not* the result of an application of the elements implicit in the State's burden. In fact, the majority opinion completely fails to acknowledge or enunciate the rules formulated by this Court and the United States Supreme Court which define the State's burden. An application of the following requirements will demonstrate the inaccuracy of the majority position.

It is fundamental that every citizen has a right to be secure in his home from warrantless searches in all but a few limited instances, and that a search conducted without a warrant issued upon probable cause is *"per se"* unreasonable in violation of the Fourth and Fourteenth Amendments to the U.S. Constitution as well as Art. 1, Sec. 9 of the Texas Constitution. In order to consistently honor the safeguards of an individual's privacy and security against arbitrary invasion by governmental officials, the *per se* rule is subject only to "a few specifically established and *well-delineated* exceptions." (Emphasis added.) *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576; *Kolb v. State,* 532 S.W.2d 87; *Rice v. State,* 548 S.W.2d 725. Thus, the protections afforded by the Constitution may be waived by an individual who "effectively" consents to a search. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854. How can the majority find voluntary consent without a clear recognition of the elements required to render consent "effective"? I strongly urge that upon proper application of the governing standards such a finding is not supported by the evidence in this case.

---

6. The majority makes note that the written consent recited that the signing party, Johnson, understood that she need not consent and that the consent was made freely and voluntarily. Because the form was not introduced or admitted at trial, I fail to see how this can be considered on appeal.

7. Recognizing that the only testimony regarding the circumstances of the consent is through Johnson, the majority makes note of the fact

that her statements are in response to "leading questions" propounded by appellant's counsel. I fail to fathom the significance of this statement, particularly in light of this Court's consistent approval of the rule allowing cross-examination to be conducted with leading questions. It seems that the State acknowledged the permissibility of counsel's tactics in that no objection to the questions was tendered at trial.

There can be no question that the State bears an *affirmative* burden to demonstrate the voluntariness of consent. *Schneckloth,* supra; *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797. See also *May v. State,* 618 S.W.2d 333; *Swink v. State,* 617 S.W.2d 203; *Nastu v. State,* supra. Before consent can be effective, the State must present *clear and convincing* evidence that consent was *freely and voluntarily* given. *Schneckloth,* supra; *Bumper,* supra; *Nastu,* supra; *Martin v. State,* 610 S.W.2d 491; *Gonzales v. State,* 588 S.W.2d 355; *Escamilla v. State,* 556 S.W.2d 796; *Armstrong v. State,* 550 S.W.2d 25. These cases also establish that consent must be shown to be *positive and unequivocal,* and there can be no physical or psychological coercion or duress, actual or implied. In determining whether these elements are satisfied, this Court has consistently considered *the totality of the circumstances* surrounding the giving of consent. See *Nastu,* supra; *Kolb,* supra; *Doescher v. State,* 578 S.W.2d 385; *Villareal v. State,* 576 S.W.2d 51; *Brem v. State,* 571 S.W.2d 314. In evaluating the circumstances, consent is *not to be lightly inferred. Green v. State,* 594 S.W.2d 72. See also 51 Tex. Jur.2d, Rev., Part I, Searches and Seizures, Sec. 42, p. 722.

The majority opinion fails to recognize the necessity of demonstrating the application of these rules and has refused to hold the prosecution to its affirmative burden of establishing voluntary consent with "clear and convincing evidence." After a scrupulous examination of the evidence, how can the majority conclude the State clearly and convincingly sustained its burden when the *only* evidence introduced by the prosecutor was the officer's *conclusion* that he acted pursuant to "voluntary consent to search," and the State completely failed to examine the officer or Johnson with respect to the "circumstances" surrounding the consent? The cross-examination of Johnson suggests why the prosecutor avoided the issue. After appellant's counsel controverted the officer's testimony (that he acted after "voluntary" consent), the State again failed to establish circumstances which would support his testimony. The *only* evidence shedding light on the circumstances under which consent was given indicates that the atmosphere was tainted by, at the very least, implied psychological coercion.

This Court has examined the scope of the State's burden in cases where voluntary consent was established by no more than an officer's testimony that he was given "voluntary" consent. See *McCallum v. State,* 608 S.W.2d 222; *Brem v. State,* 571 S.W.2d 314; *Rice v. State,* supra; *Jordan v. State,* 506 S.W.2d 217; *Lowery v. State,* 499 S.W.2d 160; *Silva v. State,* 499 S.W.2d 147; *Valerio v. State,* 494 S.W.2d 892; *Ainsworth v. State,* 493 S.W.2d 517.

In *Ainsworth,* the officer's testimony that consent had been given was sufficient to justify a warrantless search because there was no evidence offered that was inconsistent with the State's claim that consent to search was given. In *Valerio,* the evidence was undisputed that the defendant personally led officers to areas where contraband was found. The State satisfied its burden because no evidence was introduced as to force, threats, coercion or other influence exerted to obtain consent. Uncontroverted testimony that a defendant consented in *Silva* was likewise held sufficient to sustain the State's burden of proof. In *McCallum* and *Brem,* the officer's testimony specifically contradicted any testimony by the defendants that consent was given under duress or coercion, but in this case the contradicting evidence deemed sufficient to sustain the State's burden was no more than a conclusory statement that voluntary consent was given. The officer in *McCallum* specifically testified that he did not threaten, coerce or force the consenting party. The defendant in *Brem* actually testified that he voluntarily signed a consent form.

The factual setting in *Lowery,* however, is most instructive when compared to the record before us today. The State introduced no evidence about how consent was obtained, how it was requested or what, if any, conversation took place between the officers and the consenting party. The officer merely testified that she consented to

a search of the apartment. Other evidence, however, demonstrated that at least five officers were in the room with pistols and shotguns and one officer testified that he heard her say she had no objection to him going through the apartment. The court held that the State had not demonstrated that consent was free and voluntary.

It is true that there is no evidence in the instant case that appellant was faced with the identical pressure of armed officers, but it can hardly be argued that a case must be a factual twin in order that it constitute persuasive authority. The case is instructive in that the allegation of consent was controverted by the defendant with evidence of coercion. Unlike *McCallum* and *Brem,* this evidence was never rebutted by the State. The *only* State's evidence was the officer's controverted conclusion that consent was given. Although his testimony may have been sufficient standing alone, the controverting evidence forces the State *to affirmatively prove the underlying circumstances supporting the officer's claim of consent,* a task that should have been attempted at an earlier stage of the trial.[8] Instead, appellant's counsel was allowed to establish facts demonstrating involuntariness during the course of the trial on cross-examination.

Johnson testified that officer Hargrave asked her to accompany him to the station for questioning. The interrogation[9] lasted for what "seemed like months," between one and a half and two hours, and Johnson endured only with constant crying. She testified that at the time she signed the consent form for the search of the house, she was fearful for her children and had been threatened by the officers that if appellant was found guilty she could be charged with capital murder. The officer told her they could get a warrant if she did not consent. After the form was signed, they took her to the residence and there asked for "another form concerning the pickup truck." She signed the form while under the same pressures and intimidation as existed at the station house. Additionally, there is no evidence in the record that she was informed by Hargrave that she had a right to refuse consent.[10]

The response by the majority to the existence of these coercive and intimidating factors is to treat each of them as though they existed in solitary. The opinion never views the "totality" of these circumstances; rather, it is stated, for example, that the claim that a warrant would be obtained is insufficient to render consent involuntary. To that I agree. But to the blind application of that rule to this case I must dissent. If the State had introduced other evidence that consent was voluntary, this threat would not render it ineffective. But the record contains unrebutted evidence of a multitude of coercive factors.

The majority finds that the officer's threat to file charges related not to the giving of consent, but to the officer's attempt to establish the facts surrounding the murder, as it was mentioned earlier in the interview. The existence of the threat during the interrogation is certainly a circumstance closer in time to the giving of con-

---

8. Early development of the issue when first raised was precluded by the trial court's ruling that appellant develop the matter on cross-examination. See text at footnote 4, above.

9. The focus of the investigation had certainly shifted to Johnson in that *Miranda* warnings had been given and a polygraph examination was suggested. At one point, Johnson apparently became so upset that a female officer arrived in an unsuccessful attempt to calm her.

10. It is true that when the circumstances support a finding of voluntary consent, the State is not required to prove that such a warning was given. *Potts v. State,* 500 S.W.2d 523; *Allen v. State,* 487 S.W.2d 120; *Cole v. State,* 484 S.W.2d 779; *DeVoyle v. State,* 471 S.W.2d 77. In other words, if other factors indicate that consent was free and voluntary, and that a reasonable person would realize he didn't have to consent, then the absence of a warning should not render consent ineffective. *Schneckloth v. Bustamonte,* supra. See also *Chase v. State,* 508 S.W.2d 605, cert. denied 419 U.S. 840, 95 S.Ct. 71, 42 L.Ed.2d 68; *Ribble v. State,* 503 S.W.2d 551. But when the absence of the warning is combined with an assertion that a warrant would be obtained anyway, the officer is, in effect, informing the party that he has no right of refusal.

sent than are some of the factors cited by the majority in support of voluntariness. The majority lists several factors that are far removed in time from the circumstances surrounding the giving of the consent. Specifically, it is noted that Johnson had previously given consent to search the house two *days* earlier. Further, it is noted by the majority that Johnson had a "previous association" with Ward, but this "association" was ten *years* earlier. By comparison, the threat of charges was posed during the questioning at the station house, no more than one and a half to two *hours* earlier, and Johnson testified that it was a pressure existing *at the time* she consented to both searches.

The majority next notes that Johnson's emotional state at the time of consent is not a controlling factor, citing *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497, and noting that she "never indicated that she did not know that she was consenting to a search." The issue is not whether she knew she was giving consent, but rather whether she consented voluntarily. Also, in *Mendenhall* there was no evidence of threats or force and the defendant was twice expressly told that she was free to decline to the search, and only thereafter explicitly consented to it. Thus, the fact that the defendant was upset and shaken did not render an otherwise voluntary consent ineffective. Again, the majority is treating the fact that Johnson cried continuously as if it were the *only* factor indicating coercion and intimidation. The majority also relies on *Martin v. State,* supra, for its generalization that "emotional" circumstances will not render consent ineffective. In that case, as distinguished from the record before us today, there was no evidence indicating that consent was involuntary and no evidence of coercion.

The majority then discounts the fact that Johnson was fearful for her children because "[t]his was a subjective fear of Johnson's not related to police conduct." The following quotation from *Schneckloth,* supra, demonstrates the significance of this factor:

"In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, *as well as the possibly vulnerable subjective state of the person who consents.*" (Emphasis added.)

Despite the fact that there is uncontroverted evidence of these several coercive factors, the majority has refused to consider their synergistic impact under the totality of the circumstances. Having "divided and conquered" each isolated coercive factor, the majority next lists several factors indicating "free choice." The effect of this position is to place a burden on the *defendant* to establish physical abuse and resistance even though it is *not* his burden to prove involuntariness.

In my view, many of these factors are irrelevant. The fact that the questioning occurred in the afternoon is meaningless in light of the fact that the questioning occurred indoors. Why is a station house interrogation conducted inside any less coercive at 4:00 in the afternoon? [11] The fact that Johnson agreed to go to the station house has no controverting effect on the intimidating circumstances immediately surrounding the consent.[12] Further, the absence of physical abuse is not "indicative that consent given was voluntary" in that subtle and implied coercion will clearly defeat a finding of voluntariness:

"It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in

11. In light of the fact that Johnson worked the 7 p. m. to 7 a. m. shift, it could be supposed that 4 p. m. would be "in the middle of the night" for her, comparable to 4 a. m. for someone working the day shift.

12. Authority cited by the majority only supports the proposition that a defendant is precluded from complaining about the station house environment as *inherently* coercive when in fact he agreed to be questioned at that site. It does not give carte blanche to whatever occurs at the station house.

that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound that in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon."

*Schneckloth,* supra, citing *Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746.

The majority in two of its irrelevant factors relies on events far removed in time from the circumstances surrounding the giving of consent. First it relies on what the majority characterizes as previous consent by Johnson to search the house. The record actually reveals that *appellant* had previously consented, and that neither appellant nor Johnson had prevented the officers from looking around. Even if the evidence supported the majority's assertion that "consent" had previously been given by Johnson, I would question its significance since that event was two *days* before the search now at issue. The other factor suffering temporal displacement is the majority's reliance on Johnson's previous work association with Ward ten *years* earlier (when Johnson was 15 years old), which she did not even remember until reminded by Ward. It is rank speculation for the majority to claim, in the face of Johnson's unrebutted description of the true events, that this forgotten "association" would make the situation "less intimidating."

The majority also notes that when Johnson became upset, the questioning ceased and a female officer brought her coffee to calm her, citing a case where a consenting party got some sleep before giving consent. This factor borders on insignificance because the female officer was apparently *unsuccessful* in attempting to calm Johnson. She testified that she never stopped crying and that at the time the consent was given, she was fearful of charges and was still upset and crying.

The majority states that a "person acting against her self-interest is less likely to be acting voluntarily" for the proposition that Johnson's consent was voluntary because she was not acting against her self-interest. First of all, there is no testimony that Johnson thought she was acting in accordance with her self-interest when she consented. Secondly, in *Mendenhall* the Supreme Court rejected the argument that a defendant would not voluntarily consent to a search where it was obviously against his self-interest. The Court stated:

"And in response to the argument that the respondent would not voluntarily have consented to a search that was likely to disclose the narcotics that she carried, we repeat that *the question is not whether the respondent acted in her ultimate self-interest, but whether she acted voluntarily.*" (Emphasis added.)

As further indicia of voluntariness, the majority notes that "the State and Johnson were working together" because the district attorney's office provided her with a place to stay on the evening following the consent. It is further noted that once consent was given, the interests of both the State and Johnson coincided. This is based on the assumption that Johnson acted voluntarily in the first place! There is no evidence that she "actively" aided the State. In fact, the record establishes that she had lied to the officers, was threatened with a polygraph examination and was precluded from refusing to testify because the State obtained an order of immunity when she was called to testify. In any event, her subsequent status as a witness called by the State will not retroactively render her consent voluntary.

Finally, the majority finds her consent to be effective because she never testified to the contrary: specifically, she never stated that consent was involuntary or that she would not have given consent but for the coercive environment. The majority notes that she did testify and that although ap-

pellant could have asked her these questions, he chose not to. This position typifies the overall fallacy in the majority's position. The burden is simply *not* on the defendant to prove coercion. It is much more significant to again note *that the State never attempted to controvert the testimony of Johnson indicating the coercion under which she consented.*

The State failed to prove affirmatively with clear and convincing evidence that Johnson's consent was voluntary, positive and unequivocal, not the product of actual or implied psychological or physical coercion or duress. The majority simply ignores the fact that the burden of proof is on the State, and fails to view the coercive factors together as the totality of the circumstances bearing upon the voluntariness of the consent. The search and seizure violated the Federal and Texas Constitutions. I must dissent.

### V.

As its fifth and final alternative holding employed to save the State from the reversal this record clearly demands, the majority proposes to find the erroneous admission of the fruits of the unlawful search and seizure was harmless beyond a reasonable doubt. The applicable test was stated by this Court in *Jordan v. State,* 576 S.W.2d 825:

> "The test for harmless constitutional error is not whether a conviction could have been had without the improperly admitted evidence, but 'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.' *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1976)."

The majority does not discuss whether the erroneously admitted evidence might have contributed to appellant's conviction. In fact, the majority does not even say what the erroneously admitted evidence was. Instead, the majority merely recites the items that were not the product of the illegal search, and concludes that because those items of evidence would have been sufficient to support the conviction, the constitutional error was harmless. Mere sufficiency is not the test for harmless constitutional error. The issue is whether the erroneously admitted evidence might have contributed to the conviction. The majority opinion never even discusses this issue, never even recites the many items of erroneously admitted evidence, the impact of which is decisive of the issue. To this omission I must dissent.

The majority commits another serious omission in its reliance on the harmless error doctrine. In reciting the few items of evidence that were not products of the illegal search, the majority overlooks the fact that the court instructed the jury that Carroll Jean Johnson was an accomplice witness as a matter of law. Therefore, before the jury could consider her testimony it had to find sufficient corroboration from the other evidence. Art. 38.14, V.A.C.C.P. This requirement must be given consideration in any correct application of the harmless error doctrine. In deciding whether there is a reasonable possibility that the erroneously admitted evidence might have contributed to appellant's conviction, the instructions under which the jury reached its verdict must be considered. The majority ignores the high probability that the erroneously admitted evidence was used by the jury in its determination of the corroboration issue.

When the corroboration issue is not ignored, the evidence relied on by the majority that was not the result of the illegal search consisted of: appellant's fingerprint was found on a cigarette pack in the deceased's bed, a person fitting appellant's general description in a truck similar to appellant's in appearance was seen driving from the deceased's residence in the early morning hours of the night of the offense, and a woman was slumped over in the front seat, blood on appellant's boot matched deceased's type, semen from the deceased was from a person of blood type matching appellant's, hairs found on the deceased were similar to appellant's, and a heel print on the victim's apartment door was similar to

prints made by appellant's boot. In sum, the majority relies on a fingerprint not shown to have been left at the time of the offense, blood type matches, similarities in appearance near the time and place of the crime, and similarity of hair appearance and boot print.

The evidence seized in the illegal search of appellant's house and truck, on the other hand, was substantial and furnished the basis for many scientific tests and comparisons, and the resulting expert testimony. The witness testified to his opinion that leaves found on the deceased's face and on the floormat of appellant's truck were very similar and could have come from the same plant; that known head hair from the deceased and hair taken from the side of the truck were very similar and could have come from the same individual; that sweepings from appellant's and the investigator's vacuum cleaners and hair from the deceased were very similar and could have come from the same individual; that some of the hair collected underneath a throw rug in a bedroom inside the appellant's house and head hair from the deceased were very similar and could have come from the same person; that a stain on a piece of wood from appellant's porch was type A human blood (the same as deceased's); that stains on a rug, on boxsprings cuttings, on cuttings from a denim chair, and on a cutting from a mattress in appellant's bedroom were type A human blood; that a stain on a piece of cellophane from a trash can taken from appellant's house was type A human blood; that a stain on a shingle taken from the exterior of appellant's house was type A human blood; and that stains found on the frame portion of the interior of appellant's truck were type A human blood. This evidence, then, shows blood type matching and similarity of leaves and hair that serve as circumstantial inferences to link the deceased to appellant's truck and house.

The weight of this improperly admitted circumstantial evidence is at least as great as that of the circumstances relied on by the majority. I find it inconceivable that the erroneously admitted evidence did not contribute to the judgment of conviction. There is much more than a reasonable possibility that such evidence might have contributed to the verdict, either in the finding of sufficient corroboration or in the finding of guilt independently of Johnson's testimony. It is, objectively viewed, a virtual certainty that the erroneously admitted evidence contributed to the verdict.

I find none of the majority's five alternative holdings persuasive. Established law properly applied requires reversal of this conviction. I therefore am compelled to dissent to the majority's refusal to adhere to established law in its consideration of appellant's fourth ground of error.

ROBERTS and TEAGUE, JJ., join this opinion.

CLINTON, Judge, dissenting.

The dissenting opinion by my Brother Odom is factually and legally sound, and I join it without qualification. I write only to mark what appears to be a developing tendency on the part of a majority of the Court to make a hypercritical examination of objections voiced during trial basing hard issues seriously raised for review on appeal. The case at bar is yet another move that makes tendency a trend.

In his motion to suppress fruits of the searches in question, *inter alia,* appellant asserted that several titled peace officers "went to residence of Defendant and conducted a *warrantless* search of Defendant's pickup truck and residence, seizing fifty (50) items of evidence."[1] That allegation alone put the trial court on notice that the prosecution must be held to justify the searches and seizures under some exception to the warrant requirement of the Fourth Amendment to the Constitution of the United States and of Article I, § 9, Bill of Rights, of the Constitution of the State of Texas. For every search without a valid warrant is unreasonable unless shown by the officer to be within an exception to the

1. All emphasis is mine throughout unless otherwise indicated.

constitutional mandates. *Nastu v. State,* 589 S.W.2d 434, 438 (Tex.Cr.App.1979); *Stoner v. California,* 376 U.S. 483, 486, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964); *United States v. Jeffers,* 342 U.S. 48, 51, 72 S.Ct. 93, 96 L.Ed. 59 (1951); *Coolidge v. New Hampshire,* 403 U.S. 443, 454–455, 91 S.Ct. 2022, 2031–32, 29 L.Ed.2d 564 (1971).

Supplementing his written notice, during the colloquy with the trial judge, quoted in the majority opinion, appellant requested that the motion be handled like a motion in limine so that "when any of the evidence secured from a search of the residence and vehicle of this Defendant... is offered, that *it first be shown admissible* outside the presence of the jury." The judge determined to carry the motion along, as requested, and to "hear it all at the same time *when the evidence is presented by the State before the jury,*" rejecting a separate hearing. So far, it seems clear to me, all participants realized and understood that the State would be put to its burden of justifying the warrantless searches and seizures.

As soon as the State reached the point that Officer Hargrave testified as to his part in the searches, appellant objected "to any testimony concerning any search," and informed the trial court that he believed Hargrave "will testify he had consent to search and... there's a real issue... as to the *validity* of any consent to search." The trial court responded, first, that appellant "can bring it out on cross-examination" and, then, that the issue would be developed.[2]

Hargrave then testified that he conducted the search of the premises on "authority" of a "voluntary consent to search"[3] and, over an objection that such testimony was hearsay, was permitted to say that Carroll Johnson gave consent; similarly with respect to search of the pickup.

By now all participants know that the State claims voluntary consent of Johnson to search as its exception to the warrant requirement, that appellant disputes "validity" of that consent and that the trial court has decided that proof on such issue will be developed before the jury. Further, the prosecuting attorney and the trial court have been made aware that appellant contends that hearsay testimony that consent was given by Johnson is not enough to prove voluntary consent.[4] And, knowing all that, the participants are also charged with knowledge of the law, that is, "But before consent can be effective, the prosecution must prove by clear and convincing evidence that the consent was given freely and voluntarily," *Nastu,* supra, at 440.

In these circumstances, that part of the opinion in *Smith v. State,* 571 S.W.2d 168, 169–170 (Tex.Cr.App.1978) excerpted by the majority is inapposite. Smith "never contested the constitutional validity of the prior convictions" alleged for enhancement; when pen packets were offered to prove the prior convictions his imprecise objection "never designated any particular grounds upon which these pen packets violated the constitutional provisions cited." Appellant, on the other hand, met every thrust by the State with an effective party, reducing the matter the State was charged with proving down to "a voluntary consent to search" on the part of Johnson and then, in effect, protesting that the mere hearsay statement by Hargrave that Johnson gave her consent voluntarily was not enough "clear and convincing evidence" to make it so.

To say that the objections voiced by appellant from the time Hargrave was first asked about his part in the searches

---

**2.** "THE COURT: If there is, you can bring it out on cross-examination. I mean, we'll develop it if there is—it's either there or it's not there..."

**3.** The State first cut the pattern for the "authority" terminology in asking Hargrave by "what authority" he searched the residence and pickup.

**4.** As the majority acknowledges, a later objection summarized appellant's position: Testimony by Hargrave concerning the searches is violative of the stated constitutional guarantees "because they have not shown the *authority to search,* only hearsay." Thus, using the pattern already cut by the State, see note 3, *ante,* appellant is challenging proof of authority of the officers to search, not "authority" of Johnson to consent to the searches.

through his identifying Johnson as the consenter were "interpreted by the trial officials as challenging the authority of Johnson to consent to the searches and not to the voluntariness of that consent," as the majority does, is to torture the words uttered by the participants themselves.[5] But beyond that, the majority resorts to "interpretation" when none is needed. And, as indicated at the outset, that kind of threshold approach is, in my view, entirely too captious. When the parties do litigate an issue on the outcome of which constitutional law conditions admitting fruits of a search and seizure, we should be wary of concluding they did not know what they were about. See *Zillender v. State,* 557 S.W.2d 515, 517 (Tex.Cr.App.1977).

Before the Court en banc.

### OPINION ON APPELLANT'S MOTION FOR REHEARING

DALLY, Judge.

The appellant now urges that a prospective juror was improperly excused "simply because the prospective juror could not state under oath that the mandatory penalty of death or imprisonment for life would not affect his deliberations on any issue of fact if he were selected as a juror." This was not briefed as a ground of error on appeal, but it was urged in oral argument before the court on original submission. *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), has been decided since this case was argued on original submission.

The appellant asserts that the prospective juror William H. Armstrong was improperly excused in violation of the Sixth and Fourteenth Amendments as construed in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). The Supreme Court has held that the death penalty may not be imposed even if only one member of the venire was improperly excluded under the *Witherspoon* test. *Davis v. Georgia,* 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976).

The prospective juror Armstrong testified on voir dire:

"My first question to you, Mr. Armstrong, is whether or not you have conscientious scruples concerning the infliction of the penalty of death as a punishment for a crime in a proper case where the law provides for it and the facts of the case would warrant that punishment?

"A. Well, I've given that some considerable thought over the last few days and, yes, I would say that I would—that I would be in favor of capital punishment in extreme cases.

"Q. Well, let me—

"A. If—

"Q. —and could vote for it in extreme cases, is that correct, sir?

"A. In extreme—yes.

"Q. All right. Let me go into—I think by your saying that, nobody has ever had occasion to tell you what the procedure, the particular procedure, for assessing it, is that correct, sir?

"A. Yes, I believe that's correct.

"Q. Let me just jump on over and assume for a minute that a conviction has been had, because you know that there is a— and I think this might answer some of your questions in this respect.

"In the State of Texas there is a specific procedure in capital cases which is different from any other conviction—for any other crime or assessment of punishment.

"And in a capital murder case the jury is charged by the Court, as they are in other cases, but in a different way.

"The charge of the Court to the jury, the charge being the instructions and the law pertaining to the case, would tell the jury to answer two questions as opposed to voting directly upon death or life.

"These two questions are as follows; based upon the evidence—both of them, whether or not; number one, the defendant committed—well, my mind has not

<hr/>

**5.** No one in the courtroom could understand that appellant was objecting to "authority" of Johnson to consent well before she was even identified as the consenter.

got in gear yet, whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result.

"Now, that is the first question. And he would tell you to answer that question yes of no.

"But, in order to answer it 'Yes,' the State must prove to your satisfaction beyond a reasonable doubt all the necessary facts to show that 'Yes' it was committed deliberately and should have been reasonably expected to cause the death of the deceased.

"Do you see what I'm getting it?

"A. Yes, sir.

"Q. Now, the defendant doesn't have to show anything. The State has got to prove that it should be answered 'Yes.'

"The second question is; whether there is a probability that the defendant would commit criminal acts of violence that would render or that would constitute a continuing threat to society.

"That the defendant would—whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.

"Under the evidence that you have heard, plus the evidence about him personally that you are allowed to hear under the directions of the Court, whether or not taking those two things together, he probably would commit further acts of violence if he were in free society.

"Do you see what I'm talking about?

"A. Those are two separate questions?

"Q. Yes, those are two separate questions.

"A. Well, would they be answered separately?

"Q. They would be answered as two separate questions.

"Both of them, you would be charged that in order to answer them 'Yes,' the evidence must prove to you beyond a reasonable doubt that the answer should be 'Yes.'

"If it does not prove to you beyond a reasonable doubt that it should be 'Yes,' then your answer should be 'No.'

"And I would tell you that this is the way that punishment is assessed by the jury. Because, if both of those questions are answered 'Yes' the judge would sentence the defendant to death.

"You see, that takes it out of the emotional stage of things and lays it on what the evidence indicates he has done and would probably do in the future in an objective fashion.

"You see what I'm getting at?

"A. Yes, I do.

"Q. And following this procedure, if you were called upon in any case in capital murder to assess punishment, could you and would you acting upon the evidence answer these two questions, knowing that if you did answer them both 'Yes,' that the penalty would be death?

"A. Yes, I would.

"Q. And, of course, you would consider all of the evidence before you to determine whether or not the answer should be 'No,' as far as that is concerned, is that correct?

"A. Oh, yes, that's—that's correct.

"Q. And regardless of what evidence is in front of you, your answer would always have to be no unless it had been proved to your satisfaction beyond a reasonable doubt that it should be 'Yes.'

"Does that make sense to you the way I'm saying it?

"A. Yes, it does.

"Q. All right. And so, you could follow this procedure and in a proper case assess the death penalty, is that correct?

"A. Yes, I believe that would be correct.

"Q. All right. Now, this particular case, Mr. Armstrong, is one in which the indictment alleges that on or about the 31st of July of 1977, that Clarence Allen Lackey did then and there intentionally and knowingly cause the death of an individual, Toni Diane Kumph, by cutting her about the neck with a sharp instrument, and that the said Clarence Allen Lackey caused this death during the commission

of the offense of burglary of a habitation with the intent to commit rape.

"That is what a capital murder is, it's murder committed during the course of committing yet another specific offense, and that is the only time that the death penalty can result.

"And that is, that it is in the course of committing burglary or robbery or arson or kidnapping or aggravated rape, those five other felonies, or killing a policeman or fireman in the course of his duty, knowing that that is what you are doing, or doing it for hire or doing it of a prison guard attempting to escape. And, those are the only times that it is capital murder.

"Just the knowing or intentional taking of a life without justification or excuse, if you stop right there, it is murder. It does not—and, is punishable only by five to 99 years in the penitentiary of life.

"But, when it is done in the course of committing yet one of these other specific crimes, it becomes capital murder and punishable only either by death or by life imprisonment.

"Does that make clear the distinction—

"A. Yes.

"Q. —that they are two distinct offenses?

"A. Yes, sir.

"Q. All right, fine.

"Although you have never served on a jury, Mr. Armstrong, I'm sure that you recognize what I mentioned a few moments ago, that every—that the State has got to prove all of the allegations and the burden of proof is upon the State to prove a person guilty, not him to prove his innocence.

"You do understand that, do you not, sir?

"A. Yes, sir, I do.

"Q. The presumption of innocence, Mr. Armstrong, is so strong that the Court will tell you that in any case that if the defendant does not testify that not only can you not use that as evidence against him, but you cannot even allude to it or discuss it during the course of your deliberations. That in itself is not even allowable.

"It is that strong to protect him that much, and you understand that, do you not?

"A. Yes, sir.

"Q. And he will further tell you that the fact that the defendant has been indicted by grand jury, that that is no evidence of his guilt and cannot be considered as such.

"You understand that, do you not, sir?

"A. Yes, sir.

"Q. Now, one other thing insofar as this punishment, and let me mention to you before I get away from it.

"And, I have informed you that in a capital murder case that only two possible punishments are possible, life or death.

"The law says this in the Penal Code, that a prospective juror shall not be qualified to serve as a juror until you can state under oath that the mandatory penalty of death or imprisonment for life will not effect your deliberations on any issue of fact.

"In other words, think of it this way, it works throughout the trial but it is easy to relate it to the first part of the trial because that is the part of the trial that goes just to guilt or innocence, and you have got to decide that on the evidence presented here in the courtroom, have you not, sir?

"A. Yes.

"Q. You understand that?

"Well, what this section of law is saying, that you must decide those facts on those facts and evidence presented and not let any decision or deliberation you have be colored or influenced by what the punishment in capital murder is. You have got to decide them and let the chips fall where they may later on.

"Do you see what I'm saying?

"A. I see what you're saying, yes, sir.

"Q. All right. And can you so state that you would follow the law in this regard?

"A. I'm really not certain.

"Q. Do you have a question as to whether you could follow the law?

"And, I don't argue with you—

"A. Well, I'm just saying I'm not—I'm not prepared to say that I could weigh the facts of the case without the—

"Q. Without that—

"A. —without the prospect of either death or life imprisonment—

"Q. Influence you—

"A. —influencing my—

"Q. All right. Let me read this to you one more time, and I am not suggesting that it should be one way or the other, but would you, for purpose of the Court answer it yes or no when I finish.

"Would you do that for me, please, sir, to the best of your ability. I think you can—

"A. I'll try.

"Q. All right. A prospective juror—and I read it in the affirmative and I'll do it the way it is here, which is in the negative.

"A prospective juror shall be disqualified from serving as a juror unless he states under oath that the mandatory penalty of death or imprisonment for life will not effect his deliberations on any issue of fact.

"Can you state that it will not? You've got to state it under oath.

"If you can't state that it will not without—without saying 'I don't know,' you can't state that it will not.

"Do you see what I'm getting at?

"A. Yes.

"Q. If you cannot state that, just say so and that's all I'm—

"A. I cannot state that, no, sir. I surely cannot.

"MR. GRIFFIN: Your Honor, he does not qualify under this.

"I will pass the juror and—at this time.

"THE COURT: Do you have any questions?

"MR. BROWN: Is the Court going to rule that he is disqualified on that ground?

"THE COURT: I'm going to ask a question and then I'm going to determine it.

"MR. BROWN: All right, sir.

"THE COURT: The examiner, Mr. Griffin, read to you the law which is Section 12.30(b) .... and it does require exactly as was stated to you.

"In order that there will be no question about it, let me go over it directly again with you, sir, and then if you have any question let me know, and then I will ask the question almost precisely—the same question.

"I inform you that an individual adjudged guilty of a capital felony shall be punished by confinement in the Texas Department of Correction for life or by death.

"I further inform you that the case now on trial is a capital felony case.

"I further state to you that the jury is the sole judge of the facts admitted before you under the rulings of the Court.

"Do you understand?

"A. Yes, I do,

"THE COURT: Do you state under oath that the mandatory penalty of death or imprisonment for life will not affect your deliberations on any issue of fact if you are selected as a juror in this case now on trial.

"Your answer shall be "Yes' or 'No,' as you so answer.

"A. No.

"THE COURT: All right, sir.

"You understand the question, that you cannot take that oath, is that correct?

"A. I'm sorry.

"THE COURT: You—do I understand you to say that you could not.

"A. No, I could not make that oath, sir."

In *Adams v. Texas*, supra, the Supreme Court explained:

"[T]he general proposition [is] that a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. The State may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court.

" . . . If the juror is to obey his oath and follow the law of Texas, he must be willing not only to accept that in certain circumstances death is an acceptable penalty but also to answer the statutory questions without conscious distortion or bias. The State does not violate the *Witherspoon* doctrine when it excludes prospective jurors who are unable or unwilling to address the penalty questions with this degree of impartiality."

The State urges that this prospective juror showed he could not impartially decide the issues on the facts and that he was properly excused for cause. The State relies on *Williams v. State,* 622 S.W.2d 116 (Tex.Cr.App.1981); and *Porter v. State,* 623 S.W.2d 374 (Tex.Cr.App.1981).

The voir dire of the four prospective jurors was summarized in the opinion in *Williams v. State,* supra, as follows:

"Venire Member Tillman gave conflicting responses when asked whether under any circumstances he could answer the special punishment issues affirmatively. Although he initially stated that he could answer 'Yes' if the issues were proved by the evidence, Tillman later stated that his religious beliefs would prevent him from answering the punishment questions. At the conclusion of his voir dire examination Tillman agreed that he would automatically respond 'No' to one of the issues to prevent the appellant from receiving the death penalty even though the evidence was to the contrary.

"Venire Member Criner informed the trial court that she did not believe in capital punishment. Criner further stated that no matter what the evidence might show she believed that she would vote 'No' on at least one special issue to prevent the imposition of the death penalty. Criner expressed the belief that she could not answer both issues 'Yes' no matter 'how horrible the circumstances.'

"Venire Member Anderson stated that her conscience would not permit her 'under any circumstances' to answer both issues 'Yes.' Anderson agreed that she would automatically vote 'No' simply because she did not believe in the death penalty.

"Venire Member Oligney also gave conflicting answers when asked whether she could answer the punishment issues affirmatively. Oligney initially stated that she 'imagine[d]' that she could vote 'Yes' to both issues, but she was not certain. Oligney subsequently concluded that she would probably answer 'No' to at least one of the special issues 'in spite of the evidence' because she did not believe in capital punishment."

We, in that case, held:

"The record adequately demonstrates that these venire members' views about capital punishment would have prevented or substantially impaired the performance of their duties as jurors in accordance with their instructions. Thus we conclude that the trial court did not err in excusing them for cause."

We held that the court properly excused prospective jurors for cause in *Porter v. State,* supra, and relating to one of them used the following language:

"While her testimony is not as definite as the previously discussed veniremen it is sufficient to show that Mrs. Rice was properly excused for cause. During direct examination she stated she was not opposed to the death penalty but could not live with herself if she participated in returning a death penalty. When asked if she would exclude the death penalty regardless of what the facts revealed she said, 'I would assume, yes.' She later added that she would answer 'No' to the special issue questions because of what a 'Yes' answer would do to her. On cross-examination the juror stated she believed in the death penalty but did not want to do it herself. She indicated she could set aside her reluctance and determine guilt or innocence. However, when asked if she could set aside this reluctance and 'do your duty as a citizen and make whatever decision based upon the evidence before you that the law might require' she said she did not know. On redirect the following occurred:

**476**

" 'Q. [C]an you sit in judgment in this case . . . and assume the full responsibility of a juror and be fair to both sides as to the facts and the punishment and take that oath of office.

" 'A. No.

" * * * * *

" 'Q. [W]ould you vote against the death penalty as a juror in a capital murder case, regardless of the facts and circumstances that might emerge during the trial of the case?

" 'A. Yes, sir.

" 'Q. And, as you sit here right now, are you irrevocably committed at this time to vote against the death penalty, regardless of the facts and circumstances that might emerge during the trial?

" 'A. Yes, sir.'

"This testimony of the venireman made it clear that she could not be trusted to abide by existing law or follow conscientiously the instructions of the trial judge. *Lockett v. Ohio,* [438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)]; *Vigneault v. State,* [600 S.W.2d 318 (Tex.Cr.App. 1980)]; *Ex parte Chambers,* [612 S.W.2d 572 (Tex.Cr.App.1981)]; *Sanne v. State,* [609 S.W.2d 762 (Tex.Cr.App.1980)]."

When the voir dire examination of Armstrong is considered in view of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), *Adams v. Texas,* supra, *Williams v. State,* supra, and *Porter v. State,* supra, we conclude that the prospective juror Armstrong was, over objection, prematurely and improperly excused. He had not testified that his beliefs about capital punishment were so strong that he would disregard the evidence and answer the questions required by Article 37.071, V.A.C.C.P. so that the death penalty could not be assessed. The prospective jurors in *Williams v. State,* supra, and *Porter v. State,* supra, had testified that their beliefs against capital punishment were so strong that they would in any case vote "No" in

answer to at least one of the questions required by Article 37.071, V.A.C.C.P. so that a defendant could not receive the death penalty. The holding of the Supreme Court in *Adams v. Texas,*[1] supra, requires that the judgment in this case be reversed. See also *Burns v. Estelle,* 626 F.2d 396 (5th Cir. 1980).

The judgment is reversed and the cause is remanded to the trial court.

---

1. The author of this opinion of course agrees with Mr. Justice Rehnquist that the majority of the Supreme Court was wrong in *Adams v.* *Texas,* supra. See majority opinion in *Loudres v. State,* 614 S.W.2d 407 (Tex.Cr.App.1981).